## IN RE APPLICATION FOR DISCIPLINE OF
### EUGENE A. RERAT.[1]

August 11, 1950.

No. 34,475.

[1]Reported in 44 N. W. (2d) 273.

2

See, 227 Minn. 248, 35 N. W. (2d) 291.

*William C. Blethen, Cyrus A. Field, Paul C. Thomas,* and *Charles H. Richter,* for petitioner.

*Roger L. Dell, Mart M. Monaghan, John Ott, Ben R. Toensing, William A. Tautges, Walter J. Welch,* and *Donald A. Chapman,* for respondent.

FRANK T. GALLAGHER, Justice.

Disciplinary proceedings upon the petition of the Practice of Law Committee of the Minnesota State Bar Association, referred to hereinafter as petitioner, for the discipline of Eugene A. Rerat as attorney at law, referred to hereinafter as respondent.

The matter was duly referred by an order of this court, dated October 15, 1947, to the Honorable Rol E. Barron, judge of the district court of the seventh judicial district, as referee to take testimony in the proceedings and report the same to this court, together with findings of fact. Thereafter, the referee caused the matter to come on for hearing at the courthouse in the city of Minneapolis.

Petitioner's bill of particulars, as amended, consisted of 29 cases in which respondent was accused of organized solicitation. No proof was offered by petitioner in 19 of these cases. The referee made separate findings in connection with the other ten cases listed in petitioner's bill of particulars, involving a period of time from 1941 to 1946, inclusive. The names of the cases referred to in the findings are as follows: Orris E. Heller, C. T. Curran, John B. Schneider, H. J. Ireland, Frank Lowery, Mary Jo Overstake, Jack Roger Davis, Christian Butherus, Mrs. Natle Kline, and Hershel Salters. In its brief to this court, petitioner lists six of these cases, which it contends clearly show organized solicitation on the part of respondent, to wit: Christian Butherus, Mary Jo Overstake, Jack Roger Davis (Hillys Kline and Carroll C. Kline), Mrs. Natle Kline (Rose C. Kline, formerly Rose C. Natle), Orris E. Heller, and C. T. Curran. We shall refer to these cases later.

The court is confronted in connection with this disciplinary proceeding with a record of about 3,700 typewritten pages, approximately 255 exhibits of various kinds and nature, including affidavits, statements, and depositions; the findings of the referee

consisting of 29 pages; and approximately 190 pages of printed briefs. Obviously, it would be impossible in this opinion, without unduly prolonging it, to attempt to satisfactorily discuss the contents of this vast mass of material in any detailed or exhaustive manner.

Briefly, petitioner charges respondent with professional misconduct in connection with the solicitation of personal injury cases in various states, particularly in the state of Nebraska, all contrary to the rules of conduct for lawyers enunciated by this court and contrary to the Canons of Ethics adopted by the American and the Minnesota State Bar Associations.

This court has already stated that it considers a proceeding instituted by the State Board of Law Examiners to discipline an attorney in a different light from that of an ordinary action. It is a proceeding *sui generis*. In re Disbarment of McDonald, 204 Minn. 61, 64, 282 N. W. 677, 679, 284 N. W. 888; In re Application for Discipline of Rerat, 224 Minn. 124, 127, 28 N. W. (2d) 168, 172. This rule applies also to proceedings instituted by the Practice of Law Committee of the Minnesota State Bar Association, as here. In the Rerat case we said that a disciplinary proceeding is not the trial of an action or suit between adverse parties, but an investigation or inquiry by the court into the conduct of one of its officers in order to determine his fitness to continue as a member of his profession. We also said (224 Minn. 128, 28 N. W. [2d] 172):

"Although the exercise of the court's disciplinary jurisdiction is not to be encumbered by the technical rules and formal requirements of either criminal or civil procedure, nevertheless, in the conduct of a disciplinary inquiry by the court, it is essential that the requirements of due process of law be observed, and to this end the charges of professional misconduct, though informal, should be sufficiently clear and specific, in the light of the circumstances of each case, to afford the respondent an opportunity to anticipate, prepare, and present his defense. It goes without

saying that a proceeding which may result in depriving a person of the right of following a profession to which he has dedicated his life is a serious matter. It deprives him of his established means of livelihood. He is entitled to a fair and impartial hearing and to a reasonable opportunity to meet the charges brought against him." (Citing cases.)

On the other hand, we also said in that case (224 Minn. 130, 28 N. W. [2d] 173):

"* * * The furnishing of pertinent evidentiary facts is a duty which respondent owes to the court as well as to himself as an aid in effecting a full and fair investigation of the charges of professional misconduct."

See, also, In re Disbarment of McDonald, 204 Minn. 61, 64, 282 N. W. 677, 679, *supra*.

In an ordinary matter, a referee's findings are treated in the same manner as the findings of a court or jury. 1 Dunnell, Dig. § 412. However, disciplinary proceedings are *sui generis*. The object of the proceeding is not to punish the offender, but to protect the court in the interest of the public good. In re Application for Discipline of Rerat, 224 Minn. 124, 127, 28 N. W. (2d) 168. Its purpose is to guard the administration of justice (In re Application of Smith for Reinstatement, 220 Minn. 197, 19 N. W. [2d] 324; In re Disbarment of Greathouse, 189 Minn. 51, 248 N. W. 735), so that the judicial system does not fall into disrespect. Thus, the question before the court is the fitness of the attorney to continue as a member of the legal profession (In re Application for Discipline of Rerat, *supra*), and the test is whether the conduct of the attorney comes up to the standards set by the Canons of Ethics. Cf. In re Disbarment of Greathouse, *supra*.

The cases recognize that to take away an attorney's means of livelihood is a serious matter; hence, proof of wrongdoing must be cogent and compelling. In re Disbarment of McDonald, 204 Minn. 61, 282 N. W. 677, 284 N. W. 888, *supra*. In In re Applica-

tion of Smith for Reinstatement, 220 Minn. 197, 200, 19 N. W. (2d) 324, 326, we said:

"An attorney should be disbarred only upon a strong and convincing showing that he is unfit to practice law and that disbarment is necessary to protect the public and to guard the administration of justice,"

although proof beyond a reasonable doubt is not necessary. State Board of Examiners in Law v. Dodge, 93 Minn. 160, 171, 100 N. W. 684, 689, where this court said:

"While it is not necessary to establish a charge against an attorney at law which will result in his disbarment, beyond a reasonable doubt, yet such a charge is so grave, and the consequences of a conviction so serious, that something more than a preponderance of the evidence—the rule in civil actions—is required. The rule in such a case is that, to justify a conviction, the evidence must be full, clear, and convincing."

As stated above, while we cannot possibly hope to exhaustively detail in this opinion the vast record before us, we have examined carefully the six cases referred to in petitioner's brief as the ones petitioner considers as clearly showing solicitation on the part of respondent; we have compared the record with the findings of the referee in connection with these cases; and we shall state our observations. Before doing so, we must state, however, that we are confronted in each case with conflicting testimony, statements, counterstatements, denials, and repudiations of former statements or testimony. This necessarily leaves us in a quandary in many instances as to just what the facts were.

### 1.

#### CHRISTIAN BUTHERUS CASE.

Petitioner calls our attention to the deposition of Christian Butherus as establishing "a clear-cut picture of solicitation."

Butherus, a man about 65 years of age and a resident of Holbrook, Nebraska, was injured on March 2, 1944, in a railway ac-

cident. Among the exhibits is a retainer agreement signed by Christian Butherus employing respondent to represent him in connection with his claim against the Chicago, Burlington & Quincy Railroad Company. According to Butherus's deposition, he was asked if John E. Kalar came to his home after the accident, and he replied that he did not know his name, but supposed "that's what it was"; that he did not ask him to come; that he did not know respondent before he saw this man and had never heard of him until that time; and that he later settled his case with the railroad company without respondent and that he paid respondent no attorney's fees. Petitioner also introduced its exhibit Z-66, purporting to be the address of Kalar and respondent, claimed to have been left with Butherus by Kalar.

Petitioner's exhibit Z-42 to Z-45, inclusive, were included in the deposition of Butherus. They purport to be letters addressed to Butherus, written on respondent's stationery and signed with respondent's name. The letters appear to contain statements thanking Butherus for placing the case in respondent's office, and they contain certain instructions and admonitions in connection with the case. Also included in the record is petitioner's exhibit Z-33, a joint account card of the Northwestern National Bank of Minneapolis upon which one of the names signed is John E. Kalar. Petitioner's handwriting expert testified that the name of Eugene A. Rerat on exhibits Z-42 to Z-45, inclusive, was signed by the same person who signed the name John E. Kalar on exhibit Z-33. Respondent's handwriting expert testified that the names on the bottom of exhibits Z-42 to Z-45, inclusive, were not written by the same person writing the name John E. Kalar on exhibit Z-33. Thus, we have a conflict between the handwriting experts as to just who signed the letters. In any event, it does not appear to be the contention that respondent signed any of the letters personally.

The record further shows that Butherus testified on cross-examination that he was long acquainted with a party named Breaker, who had also been injured while working for the Bur-

8

lington. Butherus had been his foreman for some years. It appears that after Butherus was injured his son-in-law sent him a newspaper clipping about Breaker's suit in connection with his case, which was handled by respondent. It later appeared that Breaker called on Butherus, and the latter showed Breaker the newspaper clipping. There was some talk about their injuries and about Breaker's suit against the railroad company. Breaker wrote respondent on February 12, 1945 (respondent's exhibit 19[2]) to the effect that Butherus wanted him to come and see him. The latter denied that he had asked Breaker to do so. On February 21, 1945, Kalar, who has been classified as an investigator by respondent, called on Butherus, and the latter signed a contract retaining respondent to represent him. After this, according to the referee's findings, respondent commenced an action against the Burlington Railroad Company in the United States District Court at Minneapolis. Thereafter and without the knowledge of respondent, two men from the railroad, according to Butherus, called upon him and settled the case. When asked if he knew

[2]"Orleans Nebr
"Feb 12, 1945

"Mr Eugene A Rerat
"Minn Minn
"Dear Sir

"Mr Chris Butherus of Holbrook Nebr. (Section foreman) was injured 2nd day of March 1944. Has not drawn no money from the Burlington R.R. Since he got hurt As he saw the publication in the paper where I had filed suit against the R.R. for injury, and he has a permanent injury. Skull Left arm and other parts of body injured He would like for you to call on him. Soon as possible He is a man of nearly 63 R.R. is doing with him same as they did with me. He would like to talk to you I feel just the same as I did when your men was here

"Sincerely yours,
"Fred Breaker
"Orleans Nebr

"P.S. There has not been any claim agents or any one else here to see me since Mr Brady was here.
"# 191"

John Samson, Butherus said he did not, but answered that he remembered one fellow from the attorney general's office who took an affidavit from him. The referee found that it was the claim agent for the Burlington who settled the case without the knowledge of respondent and that he was accompanied "by the omnipresent Special Assistant Attorney General Samson." It appears that Butherus paid no attorney's fees to respondent. The railroad company apparently recognized respondent's employment and paid his fees.

The referee considered that, while the testimony of Butherus on direct examination might sustain petitioner's claim of solicitation, if Breaker's letter to respondent was genuine, the latter was not guilty of solicitation, and the referee found that there was no solicitation on the part of respondent in this case.

Under the facts and circumstances here, this finding of the referee would appear to be reasonable, inasmuch as we have a situation where Butherus's son-in-law sent him a newspaper clipping of the Breaker case settlement, and Breaker, whom Butherus knew, called on Butherus. Inasmuch as both had been injured, it was reasonable that they would talk over their injuries and discuss the matter of who represented Breaker in his case. If, as exhibit 19 shows, Breaker then wrote respondent to the effect that Butherus wanted to see him, it is logical that respondent would arrange to see Butherus. Accordingly, we cannot say in this instance that the referee's finding should be set aside.

## 2.
### Mary Jo Overstake Case.

Mrs. Overstake's husband died of an injury received in 1946 while in the employ of the Atchison, Topeka & Santa Fe Railroad Company. Petitioner claims that Mr. and Mrs. Frank Lowery solicited Mrs. Overstake to employ respondent to handle her case against the railway company. The Lowerys admitted being in the employ of John E. Kalar and being paid by him, and it also appears that Kalar was a part-time employe of respondent. Here,

we have another situation where Lowery himself had been injured in 1941, and respondent and one Frank McAllister handled his case. The record shows that the Lowerys came from Oklahoma City to Emporia, Kansas, where Mrs. Overstake resided, to interview her on two occasions, leaving with her a business card of Tautges, Rerat & Welch. Lowery refused to identify certain letters, purportedly signed by respondent or Kalar and addressed to him, by which petitioner attempted to show solicitation.

Mrs. Overstake's testimony, as read from her deposition, was to the effect that solicitation efforts were made on behalf of respondent by the Lowerys when they called on her. Respondent denied that he ever authorized the Lowerys to interview Mrs. Overstake. It appears from the record that she never hired respondent, stated that she had no intention of hiring him, and that she settled directly with the railway company. It appeared on cross-examination of Joseph J. Brennan, superintendent of special service for the Santa Fe Railroad company, that he was instrumental in bringing Mrs. Overstake to Minneapolis during the hearing for the purpose of testifying as a witness; that she remained here for a while and was not called as a witness; and that she was then permitted to return to her home. It further appears that Mrs. Overstake's presence in Minneapolis during the hearing was not made known to either the referee or counsel for respondent until about a week after she left. With reference to this, the referee said in part:

"Neither the Referee, Respondent, nor counsel for Respondent, were advised of her availability as a witness. Neither the Referee, Respondent, nor counsel for Respondent, were aware of her presence in Minneapolis until March 30th, when Brennan testified that he had sent her home a week before."

The referee found that there was no evidence that respondent had authorized the Lowerys to solicit business or that he had ever heard of the Overstake case. In fact, respondent testified that

he never heard of or saw the name Overstake until it appeared in the bill of particulars.

The referee found that there was a lack of clear and convincing proof in this case that either respondent or any responsible employe of his solicited employment in this case. He therefore found no solicitation on the part of respondent in the Overstake case.

We are inclined to agree with the referee in his comments that he could not overlook the matter of using the Overstake deposition when this witness was present in Minneapolis and available as a witness during at least part of the time that evidence was taken. In a hearing such as the one before the referee, it would certainly seem that if Mrs. Overstake was there during the hearing, and this was known to petitioner but not known to the referee or respondent, an effort should have been made to have her testify personally in lieu of using her deposition. By doing this, the referee would have had an opportunity to observe the witness, and both parties could have questioned her, subject to rulings by the referee in connection with her testimony. This, in our opinion, would have been far more desirable than reading into the record testimony taken at a deposition proceeding. The referee recognized in his comments on this case that he appreciated the difficulty confronted by petitioner, as well as respondent, in keeping witnesses in attendance at the hearing, particularly from other states. He said, however, that in order to meet this situation he had permitted witnesses to be called out of order and had offered to and did hold evening sessions to expedite the hearing. It was his conclusion that, since Mrs. Overstake was in Minneapolis, the referee and respondent's counsel should have been advised as to her presence, and she should have been called as a witness by petitioner and cross-examined by respondent. The referee raised a doubt as to whether Mrs. Overstake's deposition should have been used at all under the circumstances.

12

M. S. A. 597.15 provides:

"No deposition shall be used if it appears that the reason for taking it no longer exists; but, if the party producing the deposition in such case shows sufficient cause then existing for using the same, it may be admitted."

Considering all the matters before us in this case, including statements and counterstatements, accusations, and denials, we do not feel that we should overrule the referee's finding.

### 3.

JACK ROGER DAVIS (HILLYS KLINE AND CARROLL C. KLINE) CASE.

This case involved injuries to a minor, Jack Roger Davis, aged 14 years, son of Mrs. Hillys Kline, while riding as a passenger in a bus from Fremont, Nebraska, to Des Moines, Iowa, on August 15; 1945.

Included in the record is respondent's exhibit 20, purporting to be a letter written from Omaha, Nebraska, on August 18, 1945, addressed to respondent and signed Mrs. Carroll Kline, mother of Jack Roger Davis. This letter stated in effect that the writer's son was injured in an accident on August 15 and that at the time of the writing of the letter he was confined in a hospital in Omaha. It further stated that since the writer had been in Omaha a number of people had recommended respondent to handle the case for her and had advised her to write to him. It then went on to request that respondent or someone from his office come down to Omaha to talk to her about the case, since it would be impossible for her to leave her son in his present condition. She stated that her home was in Des Moines, but that she would be in Omaha for a while, and "if you can come down I wish you would get in touch with me," stating where she could be found. Eleanor Greene, employed in respondent's office, testified that she was in the office the day the letter arrived; that respondent was out of town on a Great Lakes cruise and that the other members of the firm, Tautges and Welch, were also absent;

that she got in touch with Frank McAllister, an attorney with offices in St. Paul and Chicago, and he came to respondent's office that day; and that she showed him the letter, asked him if he would care to go ahead and handle the matter, and turned the letter over to him.

Petitioner then offered in evidence petitioner's exhibit Z-1, a record of proceedings filed in the district court of Polk county, Iowa, but this offer was rejected by the referee. An examination of that exhibit discloses that McAllister commenced an action on behalf of Jack Roger Davis, by Hillys Kline, his guardian *ad litem,* against the Interstate Transit Lines, Inc., in the superior court of Cook county, Illinois. While this suit was pending in Chicago, Interstate Transit Lines instituted injunction proceedings against Jack Roger Davis, Hillys Kline, and Carroll C. Kline in Iowa to prevent the case from being tried in Illinois and demanded that it be tried in Iowa. An Iowa attorney represented the Klines, and the only connection of McAllister with the Iowa case appears to be that his name was on the pleadings as counsel with the Iowa attorney. In any event, a decree was issued out of the district court of Polk county, Iowa, restraining the Klines from prosecuting or promoting the prosecution of the case in Illinois. Included in this decree was a finding by the court to the effect that evidence offered on behalf of Interstate Transit Lines sustained the allegations of their petition in which they alleged that respondent and McAllister solicited the business of collecting the claim for damages for personal injuries to Jack Roger Davis. The judgment or decree containing this finding was rejected by the referee when offered as evidence by petitioner. Respondent contends that at the time these injunction proceedings were instituted he was not in Minneapolis and that he had no knowledge of the proceedings until the bill of particulars in the instant case was served. We can find nothing in these proceedings which would indicate that respondent was a party to

.the action, since his name did not appear as an attorney of record in the suit brought against Interstate Transit Lines.

The referee found that respondent was never served with any process in the Iowa proceedings, that he made no appearance, nor was any appearance filed in his behalf. The referee further said:

"* * * The evidence is that the only connection Respondent had with the Davis claim was the letter that was written to his office and turned over by his secretary to Mr. McAllister. The matter was handled from then on by McAllister. Respondent never acted as the boy's attorney, made no claim for him, and the evidence fails to show any solicitation on the part of Respondent in this case."

We believe that under the facts and circumstances of this case the referee was strictly within his rights in refusing to accept the Iowa proceedings as evidence of solicitation in connection with this case. We cannot see how it has any bearing in a matter where it clearly appears that respondent at no time was attorney of record and never made any claim for services. The referee's finding of no solicitation in the Davis case is strengthened partly by the fact that it appears from the letter of Mrs. Carroll Kline, written from Omaha three days after the accident, that she was requesting respondent to consider the case. If this letter is authentic, it would hardly seem possible that respondent could have solicited the case between August 15, the date of the accident, and August 18, the date Mrs. Kline wrote to him, particularly when it appears from the record that he was on a vacation trip on the Great Lakes during that time.

4.

ORRIS E. HELLER CASE.

Orris E. Heller, an employe of the Rock Island railroad, residing at Clatonia, Nebraska, was injured July 30, 1943. Petitioner claims that respondent solicited this case, as evidenced by peti-

tioner's exhibit Z-70, and contends that the important point in this matter is petitioner's exhibit Z-15. Exhibit Z-15 is a form of contract of retainer employing Tautges, Rerat & Welch as attorneys to represent Heller. This contract was signed by Heller and shows an acceptance dated October 6, 1943—"Tautges, Rerat & Welch By Eugene A. Rerat By J. E. K." . The words, "Eugene A. Rerat By J. E. K." are written in longhand. Exhibit Z-70 is an affidavit signed by Heller before John Samson, a notary public and a special assistant attorney general of Nebraska, which we shall refer to later. Heller admitted that he signed the contract of retainer on about October 6, 1943, retaining the above-named firm, and that he received $50 a month from them for about three months thereafter. He said that he settled his case with the Rock Island and that he, not respondent, handled the settlement. He said that he never paid back the $50 a month which he had received, but that it was taken care of by the railroad company when he made his settlement. He testified in his deposition that he had never heard of respondent, but that when Kalar called on him the latter told him of all the good jobs respondent had done for Kalar in some accident settlement he had with the railroad company and that it would be a good idea if Heller tried respondent. On cross-examination, Heller said that John Samson, a former claim agent for the railroad company and at the time a special assistant attorney general for the state of Nebraska, brought him over to the hearing when the deposition was taken; that when he was injured the railroad company offered him $300 in settlement of his claim, which did not satisfy him; that he talked with one Harry Thompson, a barber in his home town, now deceased, about this offer and that the latter told him that he knew a railroad man in Lincoln who had been injured. It appears that the Lincoln person was one Pete Grandmougin, who lived next door to Thompson's daughter. Heller admitted that he thought he told Thompson that he would like to talk to "the man." It appeared later that Grandmougin came to see

Heller and that respondent had handled a case for Grandmougin. Heller admitted in effect that he asked Grandmougin to have respondent come down, and that a few days later a man from respondent's office (Kalar) came down, and he asked him to handle the case. This was in accordance with the contents of a statement which he gave Eleanor Greene, employed by respondent. In this statement (respondent's exhibit 10), he said in part: "Mr. Rerat never solicited my case nor did anyone else from his office. I specifically requested them to call on me * * *."

Pete Grandmougin testified that he had been a railroad man for a number of years and connected with the brotherhood of railway trainmen; that he was injured on December 23, 1942; that he tried to settle with the railroad claim agent, but could not do so; and that he retained respondent, whom he claims he had heard of because of cases which he had handled. He further said that respondent represented him in a satisfactory settlement and that a friendship grew out of this transaction; that Harry Thompson, while visiting at his daughter's home in Lincoln, told Grandmougin about Heller; and that later when Grandmougin visited Thompson in Clatonia the latter introduced him to Heller and talked about his case. Grandmougin claimed that Heller asked him to get in touch with respondent, which he did, and that Kalar came to see him.

It further appears that a settlement was effected by Heller direct with the railroad company, and that at the time this settlement was made on or about January 5, 1944, John A. Samson, the assistant attorney general, accompanied the claim agent and obtained an affidavit from Heller, petitioner's exhibit Z-70 above referred to. This affidavit stated in part that about October 1943 a fellow whose name he remembered as John from Minneapolis had called on him, accompanied by Mrs. Pete Grandmougin. He said that she did not come right out and tell Heller that he should retain respondent's firm, but said what respondent had done for her. He further claimed in this affidavit that the party

named John stated that he represented Tautges, Řerat & Welch and that it would be a good idea for him to hire them as counsel, and that it was John who prepared the contract of retainer, petitioner's exhibit Z-15. Nowhere in this affidavit is the last name of the party named John shown. It further appears that whatever the contract of retainer was Heller disregarded it and settled his case direct with the railroad company.

Respondent testified that Grandmougin called him at Minneapolis and told him that Heller wanted to see him. He said he was busy, but would send Kalar down to investigate the case, as he claimed that Kalar, who did some investigating for him, was one of the best investigators in the country, had worked for a number of lawyers, and that he (Kalar) went down to investigate this case; that Kalar called him from Heller's home, and he talked with Heller too; and that a week later Heller called him to the effect that he was destitute and needed money and asked respondent to loan him some, which he did. He said that Heller settled his case "behind my back."

The referee concluded, after considering the Heller deposition, the testimony of Grandmougin, and that of respondent, that the employment of respondent by Heller was the result of conversations between Heller, Thompson, and Grandmougin and that the latter communicated with respondent at Heller's request. He found no solicitation on the part of respondent in this case.

Here, we have another situation where there is much conflict between the testimony of the witnesses and the affidavits, coupled with the fact that it appears that after all Heller disregarded any purported contract he might have made with John (Kalar), as referred to in his affidavit taken the date of the settlement, petitioner's exhibit Z-70, and made a settlement direct with the company without respondent's knowledge. For these reasons, we feel that the finding of the referee should not be disturbed in the Heller case.

## 5.
### C. T. CURRAN CASE.

C. T. Curran, a resident of Lincoln, Nebraska, testified in his deposition taken January 12, 1948, that he was injured March 27, 1942, while in the employ of the Burlington railroad; that he first met respondent at his (Curran's) home in Lincoln when Pete Grandmougin brought him there, but not at the request of Curran, although he knew that Grandmougin was coming and that he had known the latter for many years. He said that respondent wanted him to turn his case against the Burlington over to him. He said that respondent called again several months later and that he furnished the money for Curran to go to Minneapolis to be examined by a doctor, but that he could not remember the time of year nor was he sure as to the year that he was there. Curran said that while he was in Minneapolis he talked the case over with respondent, but, because liability would be hard to prove, respondent lost interest in the case. On cross-examination, he said that while in Minneapolis he talked with respondent about the case, and the latter advised him to try to settle it himself and that if he could not do so to come back and see him; that he settled the case himself sometime in 1943 without aid or assistance from respondent and that he never made any contract with respondent to represent him. He admitted that respondent did not influence him. He said that he talked with the claim agent of the Burlington, with Mr. Samson (Nebraska's special assistant attorney general), and with petitioner's attorney. He admitted signing petitioner's exhibit Z-72 sometime during the summer of 1947. This was a statement to the effect that he was injured on March 27, 1942; that about six weeks afterward Pete Grandmougin, who he said was a friend of his and whom he had known for a long time, brought respondent to see him; that he discussed his case with respondent, who advised him to come to Minneapolis to see how badly he was hurt. He then stated that he went to Minneapolis a few days later and, after having

a medical examination there, discussed the matter further with respondent, who then advised him to try to settle the case himself and that if he could not to come back. He explained that Eleanor Greene took from him the statement referred to after spending two days trying to get into his house. He said that she insisted on his "giving a little statement" and that he finally signed it. He said that he had given a sworn statement to the railroad claim agent and to Mr. Samson in 1942 or 1943, and that he had refreshed his recollection from that statement the day he testified. He said that he had no idea as to the date he was in Minneapolis. Petitioner's counsel offered the statement in evidence at the time the deposition was taken, but before offering it wanted respondent to agree that it would be received in evidence without his seeing the statement. This respondent refused to do. None of this testimony, however, pertaining to Curran's statement, taken by Samson, referred to in the deposition, was read into the record before us.

Respondent testified that he was in Denver in 1942 and that he wrote Pete Grandmougin informing him that he was stopping off in Lincoln on his return to take some depositions. He claimed that Grandmougin referred him to Curran, who, he said, wanted to talk with him. While in Lincoln he called on Curran with Grandmougin, and he claims that he informed Curran that he had a tough case for liability. He further claimed that Curran wanted him to handle his case, but that he would not do so until he had made a further investigation as to liability. Respondent further testified that Curran mentioned to him that several railroad men who were injured were examined by Minneapolis doctors and that he intended to go to Minneapolis for an examination. Respondent claims that he told Curran that if he came to Minneapolis he should drop in to see him while he was there. It appears then from respondent's testimony that he got a medical report in connection with Curran's injuries and found that they were not too serious, and he claims that he recommended to Curran that he go back and settle his case and go to work again for the Burlington.

He further claims that he did not charge Curran anything for services and that the latter never complained to him about any service rendered.

Pete Grandmougin testified that he had known Curran for perhaps 10 or 12 years and that the latter talked to him about his injuries. He said that Curran had a back injury and was in a cast at practically the same time that he (Grandmougin) was when he was injured; that he could not get around very well, and he called up Grandmougin and asked him to come over and see him, as both parties lived in Lincoln. He claimed that he did call at Curran's home and that the latter wanted to know about respondent, as he was considering respondent or Mr. Davis for his lawyer. Grandmougin claimed that he told Curran he could not tell him which one to take, but that he had been very well satisfied with his attorney (respondent). He claims that Curran then asked him "how can I get hold of him." Grandmougin testified that in the meantime he had written respondent about some insurance business he had in regard to his case and had just received a letter from respondent, who had been in Denver, that he would stop in Lincoln on his way to Minneapolis. This was before Grandmougin had gone to the Curran home. He claims that in response to Curran's inquiry as to how he could get hold of respondent he replied, "* * * well, I'll tell you, Con, if you're not in too big a hurry, Mr. Rerat is going to be at my home in a day or two, and if you want to see him I'll bring him over," which he did. He claims that he did not know what took place after that or whether respondent handled Curran's case or not. He reiterated his statement that Curran asked him to contact respondent and that he took the latter over to Curran's home because of the request made to him by Curran to do so.

The referee found that respondent did not accept employment by Curran and did not act as attorney for him in connection with his injuries. He conceded that Curran's testimony by deposition was positive and adverse to respondent, but also said that the

testimony of respondent and Grandmougin was fully as positive as Curran's in contradiction of what the latter said, and that their testimony was corroborated by Curran's statement, petitioner's exhibit Z-72 referred to above. The referee found from the preponderance of proof that respondent was not guilty of solicitation in his connection with the Curran case against the Burlington.

From our examination of the record, in considering the various statements, contradictions, and uncertainties on the part of Curran as to the dates and times when he is claimed to have visited Minneapolis, we feel that the referee's findings should not be disturbed in this case.

### 6.
#### CASE OF MRS. ROSE C. KLINE, FORMERLY ROSE NATLE.

Rose Natle was the wife of Tony Natle, who was killed in a railroad accident. John Kline had been a friend of Mr. and Mrs. Natle for many years. When Tony Natle was killed, John Kline returned to Nebraska to assist Rose Natle, and they subsequently were married. Reverend Balty was the minister of the church Mr. and Mrs. Natle attended. Rose Natle apparently had faith in him and relied on his advice after her husband was killed.

Rose Natle Kline's deposition appears as petitioner's exhibit Z-54. However, she appeared as a witness at the hearing in Minneapolis, and her testimony in most respects agreed with the deposition. Reverend Balty's deposition is petitioner's exhibit Z-60. William H. Smith was Rose's attorney before she employed respondent. His deposition is petitioner's exhibit Z-62. At the trial, Rose's husband, John Kline, also appeared as a witness.

The following is the testimony of Rose Kline taken at the Minneapolis hearing. She was called as a witness by the referee so that both parties might have an opportunity to cross-examine her. She testified that at the time her first husband was killed she lived in Republican City, Nebraska; that her husband was killed in a cave-in accident while dismantling a trestle on the Burling-

ton railroad; that at the time her husband was killed she had no money, was ill, and needed assistance; that her son worked with John Kline in a shipyard on the west coast; that both she and her deceased husband had known Kline for some time; that after the accident her son Donald wired John Kline to return and help them; that John Kline arrived 10 or 12 days after Natle's death. She further testified that she had trouble with the railroad company in effecting a settlement, so John Kline, in whose advice she placed great confidence, recommended that she hire a lawyer; that because she was so ill she told her son and Kline to go ahead and handle the matter for her; that they went to the telephone office and when they came back they told her that they had called "a Eugene Rerat in Minneapolis"; that respondent told them that he would come down or send someone; that a few days later William McDonald arrived; that before McDonald arrived the witness had discussed the matter with friends and had definitely decided to put it in the lawyer's hands. She further definitely testified that McDonald was invited and that he did not come of his own initiative; that while McDonald was in town he took pictures of the accident scene and interviewed witnesses; that the church to which the witness belonged, of which Reverend Balty was pastor, did not believe in lawsuits, so she discussed with Reverend Balty the matter of suing the Burlington and apparently came to the conclusion that the suit was proper; that also killed in the same cave-in with her husband was the husband and son of a Mrs. Alexander; that Mrs. Alexander became a client of respondent; that she decided to return to Minneapolis with McDonald; and that at that time Rose was too ill to travel. She again positively testified that respondent had not solicited her case; that she was well satisfied with the settlement which respondent arranged for her, in which she received $8,333.34 out of a $12,500 settlement; that she considered respondent a good friend; and that she never complained to anyone of his solicitation.

The statement which Rose Kline gave to John Samson (petitioner's exhibit Z-55) was taken January 6, 1944. In it Rose Kline states that she was outright solicited by William McDonald; that she did not want to sue; that she changed her mind and decided to sue when McDonald persuaded her minister, Reverend Balty, to work on her. She also said in the affidavit that she went to Minneapolis with Reverend Balty; and that while they were in respondent's office respondent induced her to retain him by placing long-distance telephone calls to former clients and having these clients tell her that respondent was a good attorney.

On the witness stand, Rose Kline testified that the above affidavit was obtained under the following conditions: She was attending a friend's funeral and most of the townspeople were there; that while she was standing at the church waiting for the casket to come down the steps Mr. Samson, who she said then called himself Johnson, got out of a car bearing the legend "Sheriff" went over to her, pulled her out of the line in front of all her friends, and pushed her into the sheriff's car; that he told her he was taking her home; that she was too scared to resist and was assured that it was all right—they just wanted to talk to her about the case; that they took her home, the sheriff waited in the car, and Samson went into the house with her; that, once inside, Samson set up a typewriter and proceeded to type out a statement; that he then handed the statement to her, told her that the sheriff was outside, and that she had better sign; that he also told her not to say anything about this to respondent; and that it was about this time that John Kline arrived at the house.

With reference to her acquaintance with William Smith, Rose Kline testified as follows: That Smith was a young attorney in the town; that his father was a railroad agent for the Burlington in Kansas; that the father had recommended to her after her husband's death that she permit his son (William Smith) to handle the claim; that she thereafter received a bereavement card

from William Smith and subsequently got in touch with him; and that she had him draw her will and asked him to probate her late husband's estate. She testified, however, that she never employed him to sue the Burlington. She also said that after respondent had settled the matter with the Burlington she did not complain to Smith about respondent's handling of the case and in fact told him that the settlement was fine for her.

When cross-examined by petitioner's attorney, Rose Kline testified that William McDonald arrived two or three weeks after the accident, which occurred May 13, 1943. She denied that William Smith told her that her case against the railroad company was an "open and shut" one so far as liability was concerned and that the only question was damages. She denied telling Smith that the "Minneapolis outfit" (meaning respondent) put so much heat on her that she felt obliged to sign or that they promised her if she signed she would have $10,000 clear in three weeks. She also stated that she could not remember telling Smith that respondent persuaded her to sign by saying that she was holding up the Alexander claim against the Burlington because they had already employed respondent. She denied hearing respondent call clients by long distance to persuade her that he was a good attorney. She also testified that Reverend Balty was present in respondent's office when the conversations with respondent took place. She testified that she never signed a contract of employment with respondent, but later admitted that she was not sure. She further testified that she did not tell Samson that when William McDonald found out that Reverend Balty was the executor of her will he "bothered" Reverend Balty to get her to turn her case over to respondent. She said it was true that Reverend Balty came to her house with tickets to Minneapolis and that she declined them because she was ill, but she admitted that Reverend Balty subsequently told her it would do no harm to go to Minneapolis. She also denied telling Samson that the statement she gave him was true.

Reverend Balty stated in his deposition, which was read into the record, that he lived in Naponee, Nebraska, in June 1943 and that he was Rose Natle's pastor at that time; that in addition to his duties as a pastor he worked in a lumberyard; that he first met William McDonald at Republican City in the Rose Natle (Kline) home while he was paying a pastoral call; that he did have some conversation with McDonald, "Just a general discussion is all I recall now"; that he could not say if there was any conversation about respondent. When questioned as to any further discussion with McDonald at that time, respondent objected and was sustained on the ground that petitioner's witness (Rose Kline) had testified as to what the arrangements were. He said that McDonald gave him money and tickets to Minneapolis for him and Rose Kline in June 1943.

Petitioner complains of the exclusion by the referee of certain parts of Reverend Balty's deposition. That deposition further stated as follows: That he and Rose Kline went to Minneapolis on the tickets which McDonald gave them; that there McDonald met them and furnished transportation; that the following day he had an interview with respondent; and that settling the case and the need for a specialized lawyer were discussed. He also testified that respondent showed him photostatic copies of cases and checks that he had settled; that respondent placed long-distance calls to former clients, who assured Reverend Balty that respondent was a good attorney. He stated that he believed Rose Natle Kline signed the contract the second day they were in Minneapolis. He also stated that McDonald specifically asked him to accompany Rose Kline to Minneapolis.

At that point in the deposition, petitioner introduced petitioner's exhibit Z-61, which was an affidavit of Reverend Balty given to John Samson on January 6, 1944. That affidavit is found with the deposition of Reverend Balty and is as follows: He stated that Mrs. Alexander and her son were taken to Minneapolis by automobile by William McDonald; that McDonald then returned

to Republican City and called on Reverend Balty, urging him and Rose Kline to go to Minneapolis; that Mrs. Alexander also urged her to do so; that McDonald gave Reverend Balty tickets to Minneapolis and $50; that they decided to accept these tickets and go to Minneapolis; that while he was in Minneapolis respondent talked of big verdicts, showed him photostatic copies of checks, told him that the Burlington would not do right by Mrs. Kline, and placed the telephone calls already discussed. In the deposition, Reverend Balty acknowledged the above affidavit to be true. When the Balty deposition was read into the record at the trial, the referee admitted this affidavit for the purpose of impeachment only. *In connection with this affidavit, Reverend Balty said that Samson then used the name Johnson.*

The cross-examination in the Balty deposition was read into the record in part. Here, Reverend Balty said that he knew nothing of Samson's taking Rose Kline from the funeral. He then identified petitioner's exhibit Z-63, which was taken January 12, 1948, and admitted his signature. In this statement, which was taken by Eleanor Greene, Reverend Balty said that he did not know who paid his expenses on the Minneapolis trip; *that he advised Mrs. Kline to go to Minneapolis and consult with her brother and employ respondent only if she thought it proper; that respondent put no pressure on Reverend Balty and did not give him money; that Reverend Balty put no pressure on Rose Kline; that petitioner's charge that respondent gave Reverend Balty money to persuade Rose Kline to retain respondent was not true, but was just a joke between himself and respondent.* This statement was offered as part of the cross-examination.

Continuing his testimony in the deposition, Reverend Balty said that he did not discuss with respondent the subject of his disbarment. However, he did mention to respondent that some people thought respondent was a shyster; that respondent then placed the telephone calls, earlier discussed, to satisfy Reverend Balty of his integrity; that respondent jokingly told him that

if he could find any proof of respondent being a shyster he would donate a sum of money to Reverend Balty's church. He also testified that Rose Kline wanted to talk to respondent before they left for Minneapolis.

John Kline, Rose Kline's husband, testified at the Minneapolis hearing. He stated that he had worked on the west coast with Rose's son. He said that respondent was well known and that he had heard of him out on the coast. He said that after he returned to Republican City, following the death of Natle, Rose, her son, and Mrs. Alexander had a conference about the matter; *that they decided that inasmuch as they needed money, and in view of the railroad company stalling, they would hire respondent and that he, John Kline, went to the telephone office and called respondent. He confirmed Rose Kline's testimony to the effect that McDonald arrived later and commenced investigating. He also confirmed Rose Kline's testimony concerning Samson's taking of the statement. He believed that the telephone call to respondent was made in the month of May 1943.*

The William Smith deposition (petitioner's exhibit Z-62) was read into the record. In it, Smith said that he was an attorney at law and county judge in Franklin county, Nebraska; that on June 1, 1943, he was consulted as an attorney by Rose Natle (Kline); and that she engaged him to sue the Burlington. However, the referee excluded this part of the deposition. Smith then was shown petitioner's exhibit Z-58, a short letter from Rose Natle to Smith, saying that she had taken care of matters herself and that she did not need his services. *He said that he turned this letter over to special assistant attorney general Samson.* He also testified that by this letter Rose Kline terminated his employment. With reference to petitioner's exhibit Z-59, a settlement sheet between Rose Kline and respondent, Smith testified that he received this exhibit July 15, 1943; that at that time he had a conversation with Mrs. Kline; that he asked her how she happened to hire respondent; that she told him so much pressure was put on her by

respondent that she felt she had to sign; that they promised her $10,000 in three weeks; that Smith was a young fellow and inexperienced; and that Mrs. Alexander had already signed and she was holding up their case. Smith also testified that Reverend Balty told him that Tautges, Rerat & Welch would give him (Reverend Balty) $200 for his church if Rose Kline signed a contract. The referee excluded this because the evidence was already in as part of Reverend Balty's deposition (petitioner's exhibit Z-60). Smith also testified that he had never met Eleanor Greene. The referee excluded Smith's statement that he believed the letter from Mrs. Kline which terminated Smith's employment came from Minneapolis.

Respondent testified in regard to the matter. *He confirmed Mrs. Kline's testimony to the effect that John Kline had called him.* He said that Mrs. Alexander was brought to Minneapolis on respondent's orders; that she came ahead because Rose Kline was then ill and that the plan was to bring Rose Kline up when she was in shape to travel. He said that he took Mrs. Alexander's statement; that he is not sure if he entered into a contract of retainer with her; that McDonald then took her back to Nebraska; and that subsequently Rose Kline came up and asked him to handle her claim. He also testified that he knew nothing of William Smith. In regard to the telephone calls, respondent testified that he and Reverend Balty were in respondent's office when Reverend Balty brought up the reports of respondent's being a shyster which had come to his attention; that respondent offered to call some of his former clients and have them satisfy Reverend Balty that respondent was a reputable attorney; and that he believed that one such call was made. He also testified that he jokingly offered to give $200 to Reverend Balty's church if Reverend Balty could prove respondent was a shyster. Respondent testified that he made satisfactory settlements in both the Natle and Alexander cases and that neither party ever complained. He testified that he did advance money to Rose Kline to come to Minneapolis because she was desti-

tute; that it was a loan and that it was repaid when the case was settled.

The referee commented in his findings that the statement taken by special assistant attorney general Samson was taken under circumstances not approved by the referee; that Rose Kline appeared to be a frank and truthful witness; and that considering the evidence in its entirety he found no solicitation in the case of Rose Natle Kline against the railroad company.

From our examination of the deposition and the testimony, and particularly in view of the fact that Rose Kline testified that "We called him [respondent] ourself," it would appear that the referee was justified in finding no solicitation on the part of respondent in this case. She was further asked:

"Q. You called him yourself; you mean Mr. Rerat did not do any soliciting?

"A. That's right; he absolutely did not.

"Q. When Mr. McDonald was there, what McDonald was doing was investigating, so far as you knew?

"A. That's right."

The four other cases considered by the referee were the following: John B. Schneider, H. J. Ireland, Frank Lowery, and Hershel Salters. While these cases were not emphasized in petitioner's brief, as were the six above outlined, we have reviewed the record in connection with them in order to compare it with the findings of the referee.

### JOHN B. SCHNEIDER CASE.

Schneider was injured on January 15, 1943, while employed by the Burlington railroad in Nebraska. This is another situation where the record is so confused with contradictory affidavits and depositions in connection with Schneider's statement that it would be difficult to determine with any degree of certainty whether there was any solicitation. The first time Schneider claims to have met respondent was when the latter came to the hospital with William Barnett to see him. The next time he saw him was about three

months afterward, when respondent came to his home with Pete Grandmougin. Respondent had handled cases satisfactorily for both Barnett and Grandmougin. He claims that respondent tried to get his case on the second call; that he did not sign any contract then, but after a couple of days respondent called again and he signed a contract (petitioner's exhibit Z-73) ; and that Grandmougin was with respondent when he came the last time.

Schneider was cross-examined with reference to a deposition given May 25, 1943, in another matter and admitted giving the following testimony therein: That he had a daughter living in Minneapolis "and through the information [given by his daughter] I have been told about Mr. Tautges and Mr. Rerat." To the question, "Did anyone ever come to see you here in Lincoln, after you got hurt, about bringing a suit against the railroad company in this case?" he answered "No." When the following question was put to him:

"Q. Then this question and answer were put and made: 'Did anybody ever come out to the hospital to see you about a lawsuit?' and you answered, 'No.' That question was put to you, and that answer was made by you, is that correct?"

he replied:

"A. That may be. It must be correct if that's written down that way."

It appears here that the Schneiders and the Grandmougins lived about two and one-half blocks apart in Lincoln, and their daughters attended high school together. Grandmougin claims that after Schneider left the hospital Schneider discussed his injuries with him and asked him to get in touch with respondent, who had handled cases for both Barnett and Grandmougin. Grandmougin notified respondent, who interviewed Schneider the next time he was in Lincoln. He employed respondent, and the action resulted in a verdict of $16,500 for Schneider.

Respondent testified that the first time he talked with Schneider the latter told him that he and Grandmougin were good friends;

that he had asked Grandmougin to contact respondent; that they were longtime neighbors. He said on cross-examination that the Schneider, Curran, Heller, and Ireland cases were referred to him by Grandmougin.

The referee considered the testimony of Schneider such that it was impossible to give credence to it on account of so much contradiction, and found no solicitation in this case. We believe here that it would be impossible in the confused state of the record to overrule the findings of the referee.

### H. J. IRELAND CASE.

H. J. Ireland, an employe of the Burlington, was `injured on June 30, 1942. It appears from the record that he first met respondent when the latter called at the Lincoln General Hospital to see him with one William Barnett, whom Ireland knew. Barnett's father-in-law was in the hospital about the same time that Ireland was there, and when Barnett learned that Ireland was in the hospital he came to see him at various times. They discussed Ireland's case, and Barnett asked him if the railroad company had ever inquired about a settlement, and the latter replied, "* * * I said no, I hadn't even been able to get hold of Parmelee [railroad claim agent], * * *." When Ireland was asked if he had requested Barnett to bring respondent to the hospital, he said, "Yes, I did. * * * I said I would like to talk to him." He reiterated this when asked, "You also state that you asked Mr. Barnett to get in touch with Mr. Rerat, and have him come to see you?" and replied, "That's right, I did." It further appears that after a conference with Ireland respondent told him that he did not think the latter's injuries were serious, that the case was one of doubtful liability, and respondent advised Ireland to make a settlement directly with the railroad company. Ireland followed this advice, made a settlement with the company, and returned to work.

The referee found that respondent never acted as Ireland's attorney and never received any compensation, and that the evidence was insufficient to justify a finding of solicitation. We believe from

a review of Ireland's deposition and respondent's testimony that the referee was justified in finding that there was no solicitation on the part of respondent in this case.

### FRANK LOWERY CASE.

Frank Lowery, employed by the Santa Fe railway, was injured in 1941. It appears that later Lowery and his wife came to Minneapolis to employ attorneys to prosecute his claim against the railroad. When he arrived in the Twin Cities he contacted Frank McAllister, who was about to leave for Chicago, where he also had an office. After McAllister went over the case with Mr. and Mrs. Lowery, he was unable to delay his trip to Chicago and called respondent to inquire whether he would associate with him in the case. It then appears that respondent agreed to associate with McAllister, that he met with the Lowerys, complied with McAllister's instructions as to getting a statement of the facts, drew a contract of employment, drew the complaint, and transmitted it to McAllister at Chicago. It further appears that McAllister started an action for Lowery in Chicago and that the case was tried by a Chicago attorney and respondent. A verdict was returned in favor of Lowery for $25,000. In his deposition, Mr. Lowery testified that he employed McAllister with the understanding that Rerat was to be associated with him. McAllister died before the hearing was held.

The referee found no solicitation on the part of respondent in this case, and it appears to us from an examination of the record that respondent was really called into the case by McAllister as an associate. It is our opinion that he could hardly be charged with solicitation under the facts and circumstances here.

### HERSHEL SALTERS CASE.

Salters was employed by the Missouri, Kansas & Texas Railroad Company in Oklahoma. He was injured in 1942. A fellow named Hanson, who was a friend of Salters, was employed by the same railroad. Hanson telephoned respondent, informed him of Salters' injury, and said that he had been requested to ask respondent to

handle Salters' claim. Respondent confirmed this telephone conversation by letter (respondent's exhibit 18), which was received in evidence. It then appears that respondent telephoned L. L. Cofield, who lived at Tulsa, Oklahoma, a short distance from Muskogee, where Salters was hospitalized, and requested him to investigate the case as to liability and injuries and contact respondent. This was done. The evidence shows that Salters was not receiving satisfactory medical care and wanted to be moved from the hospital in Oklahoma, so he was moved to St. Mary's Hospital in Minneapolis. Later, suit was commenced, but the case was settled for $9,000.

The referee found no solicitation in this case. Inasmuch as petitioner laid no particular stress in its brief as to overt acts of solicitation here, we find no reason for overruling the referee's findings.

There are several names that appear frequently in connection with these proceedings, to wit: Pete Grandmougin, John Kalar, Eleanor Greene, J. J. Brennan, L. L. Cofield, Harry Benon, and John Samson, former claim agent for the Burlington and a special assistant attorney general of Nebraska. We shall refer to each of these parties to some extent in order to give a better understanding of their respective backgrounds and why they are involved in the proceedings.

### PETE GRANDMOUGIN.

Grandmougin had been a former brakeman and conductor on the Burlington for many years and resided at Lincoln, Nebraska, a railroad center for the Burlington, for about 22 years. He was injured at St. Joseph, Missouri, on September 23, 1942, and appears to have been well acquainted with railroad men in that general locality. He negotiated with the claim agent of the railroad in connection with a settlement of his case, but claims that he got nowhere and considered retaining a lawyer. He claims to have been considering more than one attorney, and it finally boiled down to respondent and Tom Davis, the latter being the regular adviser for

the Brotherhood of Railway Trainmen. He claims that he and his wife took about two weeks to decide on which of the two attorneys he would retain, as both were well known around Lincoln in connection with other cases they had handled. He finally selected respondent. He claims that he and his wife decided the matter between themselves and that no one saw them about the matter. He claims that the railroad company doctor gave him no satisfaction and that he telephoned respondent and asked him if he could come to Minneapolis for a physical examination. He later went to Minneapolis and, after obtaining a physical examination there, turned his case over to respondent to handle. He claims that he settled his case out of court and that everything was handled in a satisfactory manner. He appears to have been well pleased with respondent's services, and a friendship developed between him and respondent.

## John Kalar.

Kalar is referred to as an investigator. His name is connected with some of the cases referred to above, particularly with the Butherus and Heller cases. In connection with the Heller case, it will be recalled that respondent testified that Pete Grandmougin called him at Minneapolis from Clatonia, Nebraska, and told him "that there was a man by the name of Heller who had been injured while working for the Rock Island Railroad; and he said that he wanted to see me [respondent]." Respondent claims that he asked Grandmougin if he had known Heller for some time, and the latter explained that there was a barber by the name of Thompson who visited frequently with a family in Lincoln (his daughter), who lived next door to Grandmougin, and that Heller had asked to see Grandmougin. Respondent claimed that Grandmougin saw Heller, who asked him to get in touch with respondent; that respondent told Grandmougin that he was busy and told him that he would send someone down. Respondent claims that he sent Kalar down to Clatonia to see Heller in response to Grandmougin's call. When questioned about Kalar as to whether the latter was familiar with

investigation work in connection with liability cases, respondent replied:

"A.   Yes; yes, I think Mr. Kalar is one of the best railroad investigators in the country.

"Q.   Do you know of your own knowledge whether he has worked for a number of lawyers?

"A.   Oh, many lawyers; for many years; not only in Minneapolis, but he has worked for other lawyers in other parts of the state and in other states.

\*     \*     \*     \*     \*

"Q.   And is he a good man that can go out and make a good investigation?

"A.   Yes, sir; he understands railroad—the railroad cases very well."

### ELEANOR GREENE.

Eleanor Greene was a former secretary for respondent and is referred to by the referee as "the ubiquitous Eleanor Greene." Her name appears frequently in connection with the proceedings, particularly the Orris E. Heller case. She is the one who obtained a statement from Heller (respondent's exhibit 10) contradicting or explaining another statement made by Heller (petitioner's exhibit Z-70), which was notarized by John Samson. She also obtained a statement from C. T. Curran (petitioner's exhibit Z-72, found on page 63 of exhibit Z-71). The referee commented: "Eleanor Greene probably was adept at obtaining such statements. The result of this procedure in the Heller deposition, as in many others, is evidence so contradictory and unsatisfactory that it can be given little credence." In connection with the statement obtained by Eleanor Greene from C. T. Curran, the referee said: "The effect of his testimony is weakened by the statement he signed for the ubiquitous Eleanor Greene."

### JOSEPH J. BRENNAN.

The deposition of Joseph J. Brennan was taken January 21, 1948, at Topeka, Kansas. His title was Superintendent, Special Service,

Eastern Lines, Atchison, Topeka & Santa Fe Railway Company, with headquarters in Chicago. His general territory was west from that place to Newton, Kansas, and south via Wellington and Purcell, Oklahoma. His department did general police and investigation work on railroad accidents and claims. Claims came to his office only through the general claim agent and the law department. He said that he had known Lucas (sic) L. Cofield, referred to hereinafter, since December 1946, and that he had employed him. He made no investigation of Cofield before employing him, but said that his reputation was that of a solicitor for law firms. Cofield's employment commenced with the Santa Fe about January 1, 1947, and he was still employed under Brennan's direction on January 21, 1948. Brennan claimed that Cofield showed him income tax returns for the years from 1940 to 1943 showing an income of between $28,000 and $30,000 per year. Brennan told Cofield that he could not meet that figure, but would pay him what it would be worth as the months went along. He said that Cofield's work for the railroad was in connection with solicitation of cases against the railroad company. He said that he paid Cofield $350 in cash in December 1946; $500 in cash on January 20, 1947; $500 in cash on February 14, 1947; a bank draft for $1,500 on February 26, 1947. He said that the bank draft was payable to Cofield; that it was his understanding that Mrs. Cofield secured the draft and cashed it, but that he did not know. He said that he paid Cofield $2,000 in March 1947; $4,000 in cash and a bank draft of $3,000 in April 1947; $300 in June 1947; $400 in July 1947; $150 in cash in August; $200 on September 3, 1947; $500 in cash on October 14, 1947; $600 in December 1947; and $197.51 on January 19, 1948. He said that on October 4, 1947, he had Cofield come to Chicago from Arizona at the railroad company's expense to meet with an attorney for petitioner. He said that Cofield's work was "mostly learning how these cases went to different lawyers who solicited the case. * * * Our trouble was in Arizona and New Mexico and that is where I had him working a good deal of the time." He said that he told

Cofield in October 1947 that one of petitioner's attorneys wanted to see him; that Cofield turned over to the witness some papers and letters he had, which were given to the attorney for petitioner, who also met with Cofield on the same day. (Letters found in petitioner's exhibit Z-47, Cofield deposition.)

### JOHN SAMSON.

John Samson, whose name appears conspicuously in several of the above referred to cases, particularly those of Orris E. Heller and Mrs. Natle Kline was a special assistant attorney general for the state of Nebraska during part of the time involved in these proceedings and previous thereto had been a claim agent for various railroads. The referee said with reference to him in the Heller case:

"* * * The first statement from Heller, Ex.-70, was obtained by one John Samson, Special Assistant Attorney General of the State of Nebraska, who was a former Railroad Claim Agent. The record is not clear as to whether Samson was named Special Assistant Attorney General to investigate charges of solicitation against various attorneys, including Respondent, but it is undisputed that he was a claim agent for railroads prior to such appointment. It is common knowledge that railroad claim agents and adjusters for Insurance Companies are expert in obtaining statements favorable to their interests. * * *

\* \* \* \* \*

"* * * The claim agent of the Rock Island was accompanied by Special Assistant Attorney General Samson when settlement was made with Heller, and *it was at that time that Samson secured Heller's signature to Exhibit Z-70.* No explanation is made as to why Heller's statement was taken by Samson at the time Heller was being paid money by the Rock Island in settlement of his claim."

Again, in the Mrs. Natle Kline case, the referee said:

"A statement was taken from Mrs. Natle by Special Assistant Attorney General Samson under circumstances not approved by the Referee. She was taken from a funeral by Samson in the sheriff's

automobile and her testimony relative to the manner in which her statement was obtained discredits the statement considerably. Mrs. Natle Klein [Kline] appeared to be a frank and truthful witness."

It must be recognized from a review of the record that in most instances when statements were taken by Samson while acting as special assistant attorney general he was usually accompanied by the claim agent for the railroad company making settlement of the claim, and it appears undisputed that in each instance Samson typed the statement and had the party sign it. If part of Mrs. Kline's testimony is to be believed, it would appear that the method used by Samson in obtaining her statement is definitely subject to disapproval by this court, especially if he took her from the funeral procession of a friend and put her into the sheriff's car and if she was as scared as she claimed when she signed the statement, which he had prepared.

### HARRY BENON.

Harry Benon, one of the witnesses for petitioner, testified that he lived at Robbinsdale, Minnesota. At the time of the hearing, he testified that he was about 64 years of age and that he belonged to the switchmen's union. In addition, he said that he had solicited and handled cases on his own behalf against railroad companies since about 1930. He mentioned the following railroads with which he had done business since that time: Burlington, Rock Island, Milwaukee, Great Northern, Northern Pacific, Soo Line, and Union Pacific. He claimed that he worked for respondent for about three months around April 1, 1943, and was told that he would be paid $50 a week; in addition, he was to get a certain amount of the proceeds of what he could produce in investigating cases and sending people to respondent. When asked by the referee what percentage he was to get, he replied, "One-third." He admitted that he did not handle many cases, as he was not there very long. He claimed that he was to get one-third on all cases that he sent in and investigated. He claimed that respondent furnished him ad-

dresses which he wrote down on a piece of paper in his own handwriting, and that he called on some of these people. When asked to name some of these people, he replied, "I think I can remember one," and gave the name of Borland of Oelwein. *This was not one of the cases listed in the bill of particulars and was objected to by respondent on the ground that our decision in In re Application for Discipline of Rerat, 224 Minn. 124, 28 N. W. (2d) 168, required petitioner to introduce evidence only as to things in the bill of particulars.* Respondent argued that he did not think it was fair for him to be required to meet matters of this kind without having an opportunity to be prepared. He moved that all of Benon's testimony be stricken, but the referee denied the motion. After some further discussion between the respective attorneys and the referee, petitioner offered to prove by Benon that during the time Benon was employed by respondent he secured some three cases which were brought into respondent's office; that the witness solicited a case in St. Paul for respondent; that he was furnished the name of one Williams, a Burlington brakeman at Ottumwa, Iowa, and another, a brakeman by the name of Franklin at Brookfield, Missouri; and that he called on these people and attempted to solicit them, but was unsuccessful. This offer was denied.

Benon said that he knew John Kalar and had seen the latter several times in respondent's office during the time he (Benon) was there. He said that he knew a woman by the name of Evelyn Carmody, and when asked how he happened to meet her he replied, over respondent's objection: "I tried to get her for myself before I was associated with Mr. Rerat. * * * I tried to handle her case. * * * For myself."

On cross-examination, Benon said that he had been handling cases against railroad companies since 1930. When his memory was refreshed as to one in connection with the New York Central, he said: "I got one case, but somebody stole it from me. One of these fast babies come down and stole it from me. So I can't say I handled it with the New York Central." During the year 1948

he said that he had done business with the Union Pacific and the Great Northern; that the Great Northern case was a death case which originated in Wisconsin and was handled by him. He claimed that he went to the widow; that she did not sign a contract, but that he just handled the case with the railroad company. With further reference to a signed contract, he was asked, "* * * you just handled that with the Great Northern Company in St. Paul?" to which he replied: "If their word is not good, their signature is no good. They beat any account anyhow, so it don't go no further than one particular case." Apparently his efforts were not too successful in that case, as he said: "I didn't get nothing for all my efforts going down and helping her out, so don't remind me of it, please." When asked, still on cross-examination, "* * * you don't do work for charity, do you?" he replied: "I don't use no gun; if they don't give it to me, I can't take it away from them." He claimed that he did business with the railroads he named in 1947. Commenting on this, he said: "Yes; I had two of them stole from me from Council Bluffs, you know; I had them—" He admitted that the only time in the previous 17 years that he had not dealt directly with the railroad companies was during the three months he was employed by respondent.

Benon said that he knew Tom Smiley, who was then chief claim adjuster for the Burlington; that he met him in December 1943 in the Northwestern Bank building in Minneapolis, when Smiley called Benon at his home to meet him there; that he found out after he gave it that Smiley had come from Chicago for the express purpose of having Benon give him an affidavit against respondent. Reference to this affidavit caused considerable trouble during the examination of this witness. On direct examination, when he was asked when he worked for respondent, he could not remember, but thought it was three or four years ago. He was then handed the affidavit for the purpose of refreshing his memory. Respondent objected, but the referee permitted a reference to the affidavit for that purpose.

Benon admitted that he had made his living during the past 17 years in connection with his dealings with claims against railroad companies. When asked, "* * * you have solicited cases * * * you take those cases to the railroads and you settle them yourself; isn't that right?" he answered, "Yes, sir."

"Q. And these cases that you have represented the injured people and the widows, they have been big cases, have they not, of injuries?

"A. Yes.

"Q. Yes; some cases you have represented people who have had legoffs; armoffs; some people have been paralyzed from the waist down; and others—and some people with very serious back injuries; is that correct?

"A. Sure."

He admitted that he handled hundreds of these cases during that time.

"Q. * * * and in all of these cases you have dealt directly with the Legal Department of these various railroad companies?

"A. Claim Department; not the Legal Department.

"Q. Yes; and in other words, you have represented the people and you have made settlements for those people?

"A. Yes, sir."

He admitted on cross-examination that all the money he had received from respondent was $50 a week during the three months he was employed by him. He thought he recalled a visit to respondent's office in December 1943, after he gave the affidavit to Smiley. When asked by respondent if he (Benon) did not tell respondent at that time that Mr. Smiley had induced him to give the affidavit because he (Smiley) needed it to show solicitation on the part of respondent so that he could hold it over the latter's head, as respondent was causing the railroad too much trouble by getting too large verdicts against them, he replied, "I remember that; but not all that conversation." He denied telling respondent that what he said in the affidavit was not true. He also denied giving Donald

Chapman a subsequent affidavit. He admitted, however, that he went to respondent's office in December 1943 with the affidavit in connection with the Burlington matter referred to above.

When questioned further on cross-examination by Mr. Dell (for respondent) about this affidavit, he said that he got a call to meet Smiley, the claim agent for the Burlington, at the ticket office in the Northwestern Bank building in Minneapolis; that when he got there he was taken to an office in the building, where the affidavit was prepared; that he had never before seen the party who prepared it; that after the instrument was drawn and before he signed it there was some discussion in connection with it about his future. He admitted that he did not want to sign the affidavit, but that Smiley said something to him that prompted him to sign it. When asked what he said, Benon replied, "Do it or else." He was then asked if that meant something to him, and he said, "You bet it did. * * * It meant my livelihood."

"Q. Now will you explain to Judge Barron what you mean by the fact it meant your livelihood?

"A. Well, that he wouldn't do business with me; that's as far as I thought."

He then stated that most of his business consisted of getting claims against railroad companies for injured employes, going to claim departments and presenting these claims, and in trying to work out settlements. When asked if at the time he gave the affidavit to Smiley he had any claims pending with the Burlington, he replied: "I had something down on the ball; I don't recall what it was." He stated that he had not been admitted to the bar; that he used no lawyers in handling these claims; that the claim agents, including Smiley, knew this. He was then asked:

"Q. *Do you mean, Mr. Benon, that those companies would let you represent widows, orphans, injured people; let you negotiate the claims, and then make payments to those parties?*

"A. *Yes, sir.*

"Q. And then they would do this without having a lawyer in
the case?

"A. That's right.

"Q. That had been going on for how many years?

"A. Since 1930.

"Q. Benon, in any of those times, did they ever request you to
stop doing that, or did they just let the practice go on?

\* \* \* \* \*

"A. No.

"Q. They never did?

"A. No." (Italics supplied.)

He said that they brought injunction proceedings against him
when he was with Stiles, but that when he quit that lawyer "that
business quit too."

Benon was of the opinion that he had a right to solicit this
business. He was asked if anyone from the bar association had ever
made any complaint about his practices in this matter, and he re-
plied that they had done so some years ago, but not about railroad
accidents. He said: "\* \* \* because I have a perfect right under
the law to do what I'm doing; under the Ambulance Chaser Law,
because I'm a member of the Switchmen's Union." (Italics sup-
plied.)

The affidavit in question taken from Benon by Smiley in De-
cember 1943 is referred to as petitioner's exhibit Z-46. Benon said
that he took one copy with him and left one copy at the office where
it was made, and that it was the same affidavit which petitioner's
attorney referred to him for the purpose of refreshing his recollec-
tion. The affidavit was offered in evidence, and was objected to as
incompetent, irrelevant, and immaterial and not proper redirect ex-
amination, as respondent claimed that the witness was in no way
testifying to anything which would entitle them to cross-examine
him. In this respondent was sustained by the referee. As referred
to above, respondent claims that Benon came to his office in Decem-
ber 1943 and advised him that he had signed the affidavit and that

he showed a copy to respondent. An examination of the affidavit discloses in effect that Benon received a telephone call about April 1, 1943, from William Tautges, of the firm of Tautges, Rerat & Welch, for the purpose of discussing employment; that Tautges consulted with affiant the following day and that Tautges agreed to pay $50 a week to affiant's wife and to give affiant one-third of a net fee of any injury case which affiant was able to secure and bring to respondent's office; that the latter advanced affiant $150 on that occasion, which was understood to be ultimately a credit against the third of any net fee to be paid to affiant; that respondent furnished affiant with a list of prospects, which was supplemented from time to time; that affiant was employed approximately three months; that during that time three cases were brought into the office of Tautges, Rerat & Welch, one resulting in a verdict of $10,000 or $12,000, which was one of the cases contacted by affiant from names furnished on his prospect list; that another case from Oelwein, Iowa, was referred to respondent's office by affiant, but was never handled by respondent's office, nor was any contract signed; that a third case, arising in St. Paul, was referred to respondent's office by affiant, on which affiant claimed he was to get one-third of the attorneys' fees.

Respondent claims that when Benon brought the affidavit (exhibit Z-46) to his office Benon said, "Frank Given and Tom Smiley made me sign an affidavit against you," and that he wanted to rectify the wrong. Don Chapman, one of the attorneys for respondent, testified that he was called to respondent's office at the time Benon was there and that he talked with Benon; that as a result of this talk an affidavit was actually dictated by him to Eleanor Greene; that respondent was not present; that Chapman obtained the information from Benon as to matters put into the affidavit; that after the affidavit was dictated and written Benon read it. Over petitioner's objection, Chapman was permitted to testify that Benon said in his presence that he had been contacted by Smiley of the Burlington relative to making an affidavit (exhibit Z-46) for the

purpose of using the affidavit in a disciplinary action contemplated against respondent. Chapman testified that Benon told him that he was forced to sign the affidavit for Smiley because he (Benon) did a lot of independent adjusting for different lawyers; that he told Smiley at first that he did not want to sign any affidavit; *that he had not participated in any solicitation work for respondent whatsoever; and that he advised Smiley that he did not.* "I told Mr. Smiley, what's the use of kidding yourself; you know I did not." Chapman further testified that Benon told him that he had done an injustice to respondent, but that he (Benon) was an old man and Smiley had threatened that if he did not sign the affidavit (exhibit Z-46) Smiley would fix it so that Benon would not get any more work, not only for his railroad, but for any railroad. In connection with the affidavit which Chapman claims he prepared for Benon to sign setting forth matters testified to by Chapman, the latter claimed that Benon, after reading it stated that it was true, and asked to take the affidavit with him; that he would contact either him or respondent at a later date, but that he never did. Chapman kept a copy of the affidavit he prepared for Benon to sign, and he claimed that Benon said that the statements were true to the effect that he never did any solicitation work for respondent. This purported affidavit, prepared by Chapman and referred to as respondent's exhibit 24, was offered in evidence. It was objected to by petitioner's attorney, and the objection was sustained by the referee.

With reference to Benon's testimony, the referee found no solicitation by respondent as disclosed by this testimony, and concluded by saying:

"There are many inconsistencies in Benon's testimony. He testified he was to receive one-third of Respondent's fees in cases solicited by him for Respondent. He also testified he received a salary of $50.00 per week and no more. He received no percentage of Respondent's fees in any case. He did not demand any such percentage. He testified he was employed to solicit cases for Respond-

ent, but was not furnished with any photostatic copies of checks, newspaper clippings, etc. It is significant that although Benon claimed to have solicited cases in behalf of Respondent, Petitioner made no attempt whatsoever to include any of the cases referred to by Benon in the bill of particulars, or to introduce any evidence corroborating such solicitation from any persons allegedly solicited."

### L. L. COFIELD.

Cofield, a resident of Tulsa, Oklahoma, was an investigator of railroad accidents and was employed by various attorneys throughout the country to make investigations. Cofield's deposition was taken by petitioner in Kansas City, Missouri, on December 2, 1947, and was offered in evidence as petitioner's exhibit Z-47. At a conference held in chambers, with attorneys for both sides and a reporter present, respondent's attorney objected to the reading of the deposition. At that conference, Mr. Dell, for respondent, stated that since the taking of the deposition things had occurred which convinced him and other lawyers representing respondent that Cofield should give his testimony in court in the usual manner so that the court could have the benefit of the weight to be attached to his testimony. Mr. Dell informed the referee that Cofield was in Minneapolis and that he (Mr. Dell) had advised petitioner's attorneys on the first day of the hearing to that effect; that respondent had procured Cofield's attendance and had made him available for examination; and that in view of that fact there would be no necessity for the deposition to be read, since there was no longer any reason for its use. At that time respondent's attorney claimed that he showed petitioner's attorneys the affidavit (respondent's exhibit 1) which Cofield had signed, which affidavit had been prepared by one of the attorneys for respondent. The date of this affidavit was February 11, 1948. Mr. Dell further stated that he advised petitioner's attorneys of this matter prior to the hearing so that they could have immediate notice of the situation, *and that Cofield was not going to make the claims which he did in his deposition.* Mr. Dell claimed that he read the affidavit

to them and felt that they had no right to claim surprise and ask for cross-examination. The referee admitted the affidavit as exhibit 1, solely for the purpose of respondent's motion with reference to the reading of the deposition.

The affidavit of Cofield consists of about six typewritten pages and is shown in the record at page 826 and following. It is signed by L. L. Cofield before Mart M. Monaghan, notary public. While we cannot set it out completely here, it states in effect that affiant is the same Lou Cofield who gave the deposition in Kansas City on December 2, 1947, which was offered in evidence as petitioner's exhibit Z-47; that at the time the deposition was taken he testified to certain facts that had to do with transactions during 1942; that for six or eight months prior to the taking of the deposition he had been under a heavy mental strain occasioned by domestic troubles, when his former wife brought divorce proceedings against him, and that at that time he also had financial difficulties; that during the six to eight months prior to December 2, 1947, he "was highly nervous and very foggy mentally about past occurrences"; that since the giving of the Kansas City deposition his mental condition had cleared up; that he had gone over the testimony given in his deposition and that at the time of the giving of the affidavit of February 11, 1948, he had a clear recollection of events and details about which he was questioned on December 2, 1947; that he had gone over certain copies of the letters in his possession and was satisfied that the case referred to in the letter signed "Gene" dated November 22, 1943, about the Adkins case, was a case handled by Robert J. McDonald; that although this letter was signed "Gene" it was sent to him by Robert J. McDonald; that in regard to other letters and documents which were identified by him and marked as exhibits in the deposition he could not truthfully state where the letters came from, but that he knew at least one of them came from Robert J. McDonald and that others came from other individuals, one of whom was a certain Lee Price; that with reference to the Frank Lowery case he brought the Lowerys to Minne-

48

apolis and recommended Frank McAllister as attorney; that he called McAllister and went over the matter with him in regard to the Lowery case and introduced McAllister to Frank and Jennie Lowery; that McAllister was busy and stated that he would eventually associate respondent with him in this case; that McAllister telephoned respondent and after doing so Cofield took the Lowerys over to respondent's office, and respondent took a statement from them and had them sign a contract; that prior to taking the Lowerys to respondent's office he had not seen respondent for some time; that at the time he called at respondent's office with the Lowerys he notified respondent that he would be willing to handle railroad investigation work for him; that subsequent thereto respondent called Cofield five or six times, gave him the names of injured railroad people or their survivors, told affiant that these people had contacted him (respondent), and that respondent had requested him (Cofield) to investigate these cases; that in each of these cases the individuals whom he called upon expected affiant and knew that he was coming; that in these cases he followed respondent's instructions and made the investigations concerning the injuries and liability; that he did this type of work for respondent only for about six or eight months during 1942; and that respondent had asked him to send him his bill for expenses in connection with these investigations; that he did not comply, but requested respondent to send him money from time to time, with the understanding that they would eventually get together and straighten out all matters, which he claims was done sometime in January or February 1943. Cofield further said that at that time he told respondent that he understood he was working for the latter on the same basis as he worked for Robert J. McDonald, namely, one-third of attorney fees; that respondent "jumped and hollered and yelled and told affiant to 'get the hell out of the office,'" and that under no circumstances did respondent understand that there was any such arrangement nor would he have had such an arrangement with affiant or with any other lay person; that Cofield and re-

spondent got into a bitter argument about the matter and Cofield left the latter's office and since that time has been angry toward respondent; that during this argument affiant conceded to respondent "that there was never any express agreement of any kind that he was to get one-third of the attorney fee." Affiant further stated in the affidavit that *at no time did respondent ever request him to solicit a single case for respondent.* Affiant further stated in this affidavit that in December 1946 Joe Brennan, Superintendent of Special Service for the Eastern Division of the Santa Fe, called on him at his home in Tulsa for the purpose of getting him to work for the Santa Fe railroad to investigate the activities of a number of personal injury lawyers; that Brennan called affiant to come from Phoenix, Arizona, to Topeka, Kansas, in September 1947 for the sole purpose of discussing respondent, and "that Mr. Brennan stated that the Santa Fe was out to get Mr. Rerat and that there would be a lawyer from the Bar Association from the State of Minnesota there in Topeka to talk to affiant about Mr. Rerat"; that on October 4, 1947, after affiant had been in Topeka for about two weeks he was called to the office of Robert Clark, general claims attorney for the Santa Fe, and that there was then present Joe Brennan, Robert Clark, and one of petitioner's attorneys; that Clark told them that he did not want any part of the matter, but that after much discussion the attorney stated that he wanted affiant to give a statement against respondent; that affiant protested that it was not necessary to give a statement at that time, as he could give it in a deposition, but that Mr. Clark suggested that he should go to the hotel with the attorneys. Affiant then said that he went over to the hotel, was asked a lot of details of what occurred in 1942, while he was in a nervous, foggy, and jumpy condition mentally. He further stated in his affidavit that for about a year prior to December 2, 1947, he was employed by the Santa Fe railroad and was associated with Joe Brennan, superintendent above referred to; that his work was to investigate and attempt to secure evidence against attorneys who were representing injured

50

Santa Fe employes; and that during this period he was paid over $14,000 in cash by Brennan in connection with his activities. Affiant further stated that Brennan told him that the Santa Fe was out to disbar respondent because he had caused them "worlds of trouble in obtaining large amounts for injured employees and widows whose husbands were killed"; that Brennan complained about the Santa Fe having to carry the load in proceedings against respondent. He stated that his compensation was not specifically arranged for, but a promise was made that amounts would be determined as soon as his deposition was taken in the Rerat matter, and *that he was promised $75,000 in the event Rerat was disbarred and $37,500 if disbarment proceedings were not successful.* He further stated in his affidavit that the attorney told him he had influence with all the railroads and that if the Santa Fe did not treat him right he would not have any trouble in obtaining a good job for affiant with the Illinois Central Railroad. Brennan specifically denied the representations made by Cofield in the affidavit.

Petitioner's attorney again offered in evidence the Cofield deposition (petitioner's exhibit Z-47). Respondent again objected to the deposition on the ground that, inasmuch as Cofield was present in Minneapolis and available as a witness, there was no longer any reason for the deposition. After considerable discussion, the referee permitted the reading of those parts of the deposition which he deemed admissible, and stated that at the conclusion of the reading of the deposition the court would call Cofield, who was present in court, have him sworn, and permit both sides to cross-examine him. Petitioner's attorney then commenced the reading of the deposition, and read the cross-examination of Cofield.

On direct examination, Cofield testified that he had known respondent for 10 or 12 years and that his employment with him commenced the latter part of 1939 or the early part of 1940; that he first contacted respondent in Minneapolis; that there would be no argument about fees and "that I would receive the one-third of the fees from the clients." He said that respondent called him to

solicit and investigate; that he was to have a drawing account of $250 a week; and that he then proceeded to go to work for respondent. He testified that he would then go out and call on personal injury cases which he had heard about through reports and newspaper clippings which respondent had given him; that he was also supplied with photostatic copies of checks, letters from clients, and contract forms that could be signed. He named E. P. (Pete) Grandmougin, whose case was delivered to respondent under his arrangement. He also named several other cases. Respondent moved to strike the answer of the witness because most of the cases were not included in the bill of particulars, but his motion was denied. Among the other cases named was the Herschel Salters case. He said that he knew John Kalar, who was present at various business conferences in respondent's office, and was familiar with his signature. He identified certain exhibits signed "G," "John," and "Eleanor," consisting of letters which he claimed he had received. He also stated that Eleanor Greene was working for respondent while the witness was there.

It developed after the reading into the record of Cofield's deposition of December 2, 1947, which deposition was repudiated by his affidavit of February 11, 1948, also a part of the record, that when the time came to call Cofield as a witness, subject to cross-examination by both petitioner and respondent, he was no longer present in court, although he had been there for some time during the hearing. It appears from the referee's findings that sometime during the morning of March 18, 1948, Cofield left the state of Minnesota, notwithstanding the fact that he was under subpoena and that the subpoena had been kept good by the payment of his witness fees; that after leaving Minnesota he was in contact with Brennan, Superintendent of Special Service of the Santa Fe railroad. Mr. Brennan testified that the last time he had seen Cofield in person was January 21, 1948; that he had neither seen nor talked with Cofield between March 8, 1948, and March 20, 1948, when Cofield called Brennan on the latter date at his office in

Topeka from Tulsa, and that was the first time he had learned that Cofield had left Minneapolis. It also appears, according to the referee's findings, that Brennan was in Minneapolis at the time Cofield left the state. The referee said with respect to this:

"* * * In view of this unusual situation and in order to meet and impeach the deposition of Cofield, which had been received in evidence under the specified arrangement, Respondent was permitted to introduce evidence of Mart Monaghan, Eleanor Greene and Don Chapman. This impeaching evidence as well as the testimony given by Cofield in the deposition and in the affidavit, and the manner in which Cofield's services were employed and the large sums of money which were paid to him by the Santa Fe in cash without any record kept other than as set forth herein, *so discredit the entire transaction and relationship of Cofield to this entire matter as to make the deposition unworthy of consideration.* [Italics supplied.]

"There are certain glaring inconsistencies in Cofield's testimony taken by deposition. Cofield was employed by other attorneys during the time he worked for Respondent. His testimony shows that he left Respondent's employ in February, 1943, after a dispute over money due Cofield. He did no work for Respondent in any capacity after that dispute. We may infer that Cofield was not friendly to Respondent after February, 1943.

"Cofield's deposition was taken December 2, 1947. Attached to the deposition are many exhibits purporting to be letters received by Cofield from Respondent's office. Only one of such exhibits is on Respondent's stationery (Ex. I.I. 1), and it refers to figures for income tax reports. The other exhibits are plain envelopes with Respondent's office address typed thereon, or on copy paper with various signatures including 'G' or 'Gene' signed to them. Is it to be assumed that Respondent used plain envelopes and copy paper to prevent such correspondence being traced to his office, and then signed his name or initials and typed his office address to insure detection?

"Cofield produced 20 empty envelopes received from Respondent's office but produced none of the letters received therein. What inference should be drawn from this circumstance is not clear unless it be that the enclosures were destroyed or withheld by Cofield because they were inconsistent with his testimony.

"Cofield testified Respondent furnished him 'photostatic copies of checks, letters from clients and working material' but produced no such material. Did he save empty envelopes and scraps of paper and destroy his most cogent evidence?

"Cofield admitted the receipt of large sums of money from the Santa Fe. He was working for the Santa Fe when the deposition was taken in December, 1947. He did not know what pay he was to receive from the Santa Fe—whether his salary was $1.00 or $50.00 per day. Brennan of the Santa Fe, likewise, had no knowledge as to what part of the money paid Cofield by the Santa Fe was salary, or what part was expense. Cofield admitted to the use of at least six aliases, including his Santa Fe code name, 'Cuddles'.

"It is noteworthy coincidence that after the taking of his deposition in December, 1947, Cofield left his lucrative and anomalous position with the Santa Fe on January 1, 1948. It is quite possible that the severing of his relationship with the Santa Fe had some motivating connection with his appearance in Minneapolis and recantation of the testimony given in his deposition.

"No trier of fact could give credence to the testimony of L. L. Cofield."

It is the position of petitioner that it has been circumscribed to such an extent by the rules of procedure applied by the referee and by harassing and adversary tactics on the part of respondent that it has been impeded in its efforts to investigate and present evidence of misconduct as required by Rule XXI of the Rules of Practice of this court (222 Minn. xxxix). Petitioner contends that the findings of the referee are manifestly against the weight of the evidence and submits that the record, even when considered in the light most favorable to respondent, supports beyond a

doubt the charges of professional misconduct. It argues that respondent, from the beginning, pursued a studied, planned, and determined policy of obstruction. It complains that except for incomplete copies of income tax returns and records of a few isolated cases no records were produced in response to the *subpoena duces tecum* which was issued by the referee, particularly with reference to Cofield, Benon, Kalar, and McDonald, referred to in the proceedings as investigators.

While the record shows that respondent produced some copies of income tax returns and records of some cases, he testified that in 1946 he moved to his present office, which is a small one; that the office he was in had a large space that was used for a vault; that the owners of the building took back this space—originally intended for an elevator—from all the tenants in the building; that as a result of this change he had to move or do something with old accumulations in his office. "So I cleaned out all these papers and briefs. There were just stacks of them; of the old stuff; and kept my records on all of my cases here. And the rest of that old junk was all destroyed." When questioned whether his ledgers and journals of his business up until the time he moved were destroyed, he replied affirmatively, but said that he had all his permanent records in respect to cases; that he had disposed of five or six boxes of records for which he had no further use.

Petitioner argues that there was no explanation as to why records were not produced for at least the last six months of 1946 and refuses to believe that the records had been destroyed. Thus, we have a conflict between petitioner's contention that respondent wilfully withheld some of his records and the contention of respondent, who maintains that owing to his moving into smaller office space it was necessary for him to dispose of some of his older records on business finished prior to 1946. The period involved in the alleged solicitation under consideration ran from 1941 to 1946.

Petitioner also calls our attention to the large increase in connection with investigation expense and payments made to associates as shown by respondent's income tax returns from 1939 to 1946. A great deal of controversy arose between the parties in connection with the admission of income tax returns for certain years. Respondent contended before the referee that petitioner should not have access to his income tax reports, to which the referee replied: "Well, the Court is in no position to judge what they may or may not show with reference to the charges here. I'm satisfied no harm will be done by permitting Mr. Blethen to examine them." Exhibits Z-5 through Z-12 were marked for identification, purporting to be copies of respondent's individual income tax returns to the federal government for the years 1939 to 1946, inclusive. When questioned as to whether these were copies of his returns for those years, respondent answered that they were. Petitioner then offered the exhibits in evidence. Respondent objected on the ground that they were incompetent, irrelevant, and immaterial and were not covered by the bill of particulars, would be of no assistance to the court, as they could neither prove nor tend to prove anything in the allegations of the petition, and were matters of a confidential nature. The referee then asked petitioner to point out what items contained in the reports were of interest to the court. Petitioner stated that he would like to show by the income tax returns of respondent for the years 1939 through 1947 the fact of the modest income reported by respondent in the earlier years of that period compared with the sudden large gross income and larger net income reported by respondent. The attorney for petitioner also said that he wanted them in evidence for the reason that they reflected large sums of money paid by respondent to other lawyers and for the purposes of investigation. Petitioner's attorney said: "I mean where—for instance, in the year 1945, the sum of $70,835.00 is shown as general investigation expense; and the sum of $87,596.97 is shown as payments made to other attorneys. Case expense is listed

27,600 odd dollars; traveling expense, 27,700 odd dollars. For these items on that year, I purport to have Respondent have the opportunity of explaining who this money went to and what amount and on what basis and—." Respondent's attorney interrupted to state that he came into court charged with meeting certain specific things, and asked what materiality they could have as bearing on any of the things set out in the bill of particulars.

After much further discussion on the part of counsel, the referee stated that it was his opinion that the only material matters in the reports would be those items pertaining to fees paid to attorneys, investigations, and miscellaneous cases, and stated that he thought those were admissible. He then said: "And if counsel for the petitioner desires, he may read these figures into the record and interrogate Respondent concerning those. But except as to those items, I think the exhibits are not properly admissible, and it is so ruled." Petitioner then offered to prove, for example, by exhibit Z-5, that respondent reported a net income of $5,570.10 in 1939; by exhibit Z-6, the net income for 1940, and that respondent listed that year the sum of $745 for special office work, $2,450 as fees paid to other attorneys, and $3,238.50 for investigations and process serving; by exhibit Z-7, that for the year 1941 respondent reported a net business income of $5,545.13, and for that year reported $8,836.61 for process serving and special investigation and $11,433.81 fees to other attorneys. Exhibit Z-8 purported to be the 1942 return when respondent was self-employed. Respondent objected on the ground that this information was incompetent, irrelevant, and immaterial and, among other things, that they did not prove or disprove any of the allegations in the bill of particulars. He stressed that our decision in In re Application for Discipline of Rerat, 224 Minn. 124, 28 N. W. (2d) 168, limited petitioner to the bill of particulars, closing his objection on this point along the general line that information in the income tax returns was confidential, and that

if placed in the record petitioner's attorney could give a copy of this information to any of his clients or to anyone who asked for it. Respondent objected to the reading into the record of any figures as reflected by the income tax returns from 1939 to 1946. The referee reiterated what he had previously said as to which items he thought were admissible, stating, for example, that on petitioner's exhibit Z-8 he considered the following items admissible:· Case expense, $6,000; salaries and payment for services, $34,000; miscellaneous expense, $8,000; and said that petitioner's attorneys should be given the opportunity of examining respondent as to whether he had any record concerning these disbursements, on account of the charge in the petition that some of the so-called solicitors shared in the fees. He further said: "But as far as the total amount he took in on all of his cases for himself and his clients or what his earnings were, whether one year he made good money and other years not so good, I don't believe that it has any bearing on the case at all. And that's why I made the ruling that except for those matters that I have referred to, the exhibits would not be received." Petitioner then offered to prove by petitioner's exhibit Z-9 that in 1943 respondent was self-employed; that for that year he reported a net profit of $10,335.24; that he listed the sum of $125,215.23 for general case expense; $31,302.09 for general investigation; and $18,379.99 for traveling expense.

With reference to petitioner's exhibit Z-10 for the year 1944, petitioner contended in its offer of proof that it reflected a total business for respondent of $17,876.93 for that year, with case expense listed at $23,903.37, general investigation expense, $31,106.01, and other attorneys, $37,068.33. By petitioner's exhibit Z-11 it offered to prove that for 1945 respondent was self-employed; and that the report reflected a net business income of $35,648.73, with gross legal fees of $272,018.68; with deductions for general investigation of $70,835.32; deduction of amounts paid other attorneys of $87,596.97; general case expense of $27,599.10; and travel-

ing expense of $20,717.52. By its exhibit Z-12 (1946), petitioner offered to prove "on the return the net gross income from his business of $25,783.50; with a total receipts for that year of $258,-487.91; with total ordinary and necessary business expense deducted of $226,340.86, being included among those deductions an item of case expense of $28,452.81; general investigation in the sum of $87,250.22; and other attorneys—payments made to other attorneys, $88,124.31." Petitioner then referred to the fact that respondent's attorney had informed him that the income tax returns for 1947 had not yet been filed.

After listening to all of these offers of proof, the referee denied the offer except as to the items specified above and notified petitioner that it would be entitled to examine respondent relative to those items. Petitioner then proceeded to examine respondent and asked him if he had his account books available as to who received the amount reported for general investigation expense in 1946 and was informed that they were not available. Respondent again explained that when he moved his office "I had thrown all the files and all the stuff away, except my permanent records there." He also said that he had no record as to the amount paid to other attorneys as shown in the 1946 report, and that he had no record, such as check stubs, ledger sheets, or journal entries which would show to whom the investigation expenses and amounts to other attorneys were paid as shown in the 1945 return. Objections were made to this questioning by respondent, but overruled in each case by the referee. When asked about his income tax returns for the years 1939 through 1944, respondent again said that he had no records as to who received the investigation expense, payments to other attorneys, and case expense. He admitted that he had no cancelled check record for the years 1944 or 1945. When asked if he had cancelled checks for 1946, respondent indicated that he had, but said that he would "have to check that up." He admitted that he had cancelled checks for 1947, and when asked to produce them his attorney objected on

the ground that they were incompetent, irrelevant, and immaterial and were checks written after the proceedings were begun. The referee sustained the objection in regard to the 1947 checks. The referee assured petitioner that the offer to prove the matters referred to, petitioner's exhibits Z-5 to Z-12, inclusive, with reference to investigation expense, attorneys' fees, miscellaneous case expense, etc., would be shown in the final record, but that these figures should not be made public. Petitioner assured the referee that there was no desire to have the figures made available to the public.

Petitioner contends that for many years respondent availed himself of a newspaper clipping service as an aid in his solicitation of personal injury cases. Respondent denied that he availed himself of any such service between 1939 and 1945. When asked if he knew whether the newspaper clipping service mailed clippings concerning railroad accidents to his office, he replied, "Not that I know of; I don't know." Petitioner called as a witness the manager of Chapin Publishing Company and Press Clipping Service, who produced exhibits Z-92, Z-92A, Z-93, and Z-94 under *subpoena duces tecum*. These exhibits reflected that the clipping service regarding railroad accidents was sent to George Rerat, brother of respondent, at 322 West Broadway, Minneapolis. On March 3, 1942, the address was changed to 2155 Rand Tower, and on May 25, 1944, to 800 Foshay Tower, the office address of respondent on those dates. When the witness was questioned as to what service was furnished, respondent objected on the ground of immateriality, claiming that there was no showing of any connection between the clipping service and respondent. The referee sustained the objection on the ground of hearsay as to what service was asked for, but permitted the record to show that the service was furnished to George Rerat at the above addresses. In denying petitioner's request to have these records introduced in evidence, the referee said that he admitted what he thought was relevant.

It appears to us that there was sufficient testimony admitted into the record to show that George Rerat apparently received clippings regarding railroad accidents from the newspaper clipping service. While there is reasonable ground for suspicion that some of the clippings may have been sent to some of the persons employed by respondent as investigators, respondent denies that he availed himself of any clipping service and denied that he knew of any such service being mailed to his office. On the other hand, petitioner contends that these clippings were furnished respondent's investigators. There is nothing in the record which definitely links the services as being mailed personally to respondent or as being charged to him on the records of the companies furnishing this service. While it is true that the record seems clear that railroad accident clippings were sent to respondent's brother, we do not feel that, standing alone, they have been so connected with respondent as to justify his disbarment on the record as shown in connection with the clipping services.

There is also a controversy as to the validity of various documents shown in the record. These are of two kinds. The first group consists of letters purportedly signed by respondent or Kalar and addressed to various persons, especially Cofield, Butherus, Salters, and Lowery. In varying degrees, some of these letters would appear to strengthen petitioner's claim of organized solicitation. The second group consists of checks and releases purportedly endorsed or witnessed by respondent. It is apparently conceded by petitioner that respondent did not sign the letters contained in the first group. However, petitioner's handwriting expert, George W. Schwartz, testified that John Kalar had written them. He also testified that in many instances documents of the second group were in fact signed by Kalar and not by respondent. Mr. Schwartz admitted on cross-examination that his findings did not contradict respondent's earlier testimony as to which of the exhibits he had signed and which he had not. Apparently, it is petitioner's position that although the checks and releases

shown in the second group were not incriminating they at least showed the extent of Kalar's activities in respondent's behalf. Respondent admitted that Kalar spent a good deal of time in respondent's office, but denied that he was authorized to sign respondent's name except in specific cases. Respondent's handwriting expert, Ralph E. Kirpach, in almost all cases flatly contradicted the assertions that Kalar signed these letters. However, he was not shown petitioner's exhibits Z-39 and Z-40. The former consists of a writing with lead pencil on yellow copy paper and reads as follows:

"Lou:

"Tell Lucille there are no more socks here—have sent you books by express—How about a good deal against the Q real soon—

"J"

Petitioner's exhibit Z-40 was another longhand writing, with ink, on yellow copy paper, and contained the following:

"Dear Lou:

"There have sure been a lot of good ones this month—How many will we get—May be you should get to Ill. & Kentucky on some of those good ones—

"Bring in one soon—

"John"

Attached to this exhibit was an envelope (petitioner's exhibit 40-b) addressed to "Mr. Lou Cofield, 1213 S. Marion Street, Tulsa, Oklahoma," bearing a posting at Minneapolis dated November 17, 1942. In the upper right-hand corner of the envelope was typewritten "2155 Rand Tower Minneapolis, Minn." Also attached to the letter was petitioner's exhibit Z-40-a, purporting to be a newspaper clipping on which was stamped "Western Press Clipping Exchange, Minneapolis, Minn." The clipping, apparently taken from the St. Paul Pioneer Press, dated November 16, 1942, referred to a Neillsville, Wisconsin, railroad workman who was killed by a work train on a certain railroad. Petitioner's handwriting expert testi-

fied that petitioner's exhibits Z-39 and Z-40 were in the same handwriting as the signature John E. Kalar shown by petitioner's exhibit Z-33, the joint account signature card referred to above. Kalar did not testify.

An examination of petitioner's exhibits Z-39 and Z-40 does not disclose a great deal, unless by insinuation. The exhibits are neither dated, nor are they signed by last names, nor do they appear to convey any very lucid messages. While we are somewhat impressed with petitioner's argument that Kalar carried on a solicitation with at least the sufferance of respondent, we do not believe that this evidence alone warrants discipline or disbarment. The expert handwriting testimony was contradictory. The referee apparently chose to believe respondent's expert, and we do not feel warranted in overruling the referee in connection with this kind of testimony in view of the fact that he was present and had an opportunity to make his observations in the entire matter. While petitioner's exhibits Z-39 and Z-40 were not shown respondent's expert, the vagueness of these exhibits would make it difficult for us to say that they could be considered as convincing testimony that either the party who signed "J" on exhibit Z-39 or "John" on exhibit Z-40 were actually soliciting on behalf of respondent. Kalar did not testify, but it is apparent that he had acted as an independent investigator and had dealt with other lawyers from time to time, as well as with respondent. If that was the general nature of his work, it could be inferred that if some of these disputed exhibits were actually written by Kalar he could possibly have been attempting to solicit on behalf of other lawyers he was representing as well as respondent. While all busy lawyers may from time to time require additional help or investigators, we would admonish respondent, as well as others, to refrain in the future from association with such investigators as might cast suspicion upon their profession or their legal practice.

We realize that while we have attempted to go over this vast record as comprehensively as possible there are still many details which cannot be properly discussed. All parties conceded on the oral argument before this court that a tremendous record had been turned over to us for our consideration. We have conscientiously attempted to examine what we considered the most important parts of this record, including the exhibits. We have also carefully reviewed the findings of the referee. Our examination of this record convinces us that upon the complaints received petitioner was justified in making its investigation. It is our opinion that the investigation was intensive and that petitioner attempted to properly submit to this court all the facts available under the circumstances. There are some discrepancies and inefficiencies on respondent's part in connection with the case, particularly his inability to furnish specific records as to certain items paid out for investigation expense and amounts paid other attorneys during the period involved here. We realize that in any law office where a vast amount of business is done records may be disposed of from time to time in order to cope with the problems of space. However, we think that respondent, even though he moved his office in 1946, should have had available more specific data, particularly with reference to certain items paid out during the latter part of that year. We are not entirely satisfied under the facts and circumstances here that respondent has fully explained all transactions during the period involved as completely as they should have been explained. We are faced, however, with the serious problem of determining whether the record before us is sufficient under the circumstances and under the referee's findings to discipline or disbar respondent. In determining this, we must necessarily consider that in disbarring an attorney we are depriving him of his right to earn a livelihood in the profession in which he has spent many years of preparation. On the other hand, we must consider that one who wilfully violates the Canons of Ethics in connection with the legal profes-

sion not only harms himself, but harms the profession in general.

It is evident here that respondent apparently had been quite successful in obtaining settlements in connection with accidental death and injury claims against railroad companies. It is also evident that his business extended over a considerable area. None of the six specific cases urged most emphatically by petitioner in its brief arose in Minnesota. It is self-evident that in doing as extensive and successful a business as apparently was done by respondent he would acquire quite a large circle of friends, some well-wishers, and quite a reputation as a successful lawyer, particularly among railroad people. If, as a result of this wide acquaintanceship, he made contacts based on his reputation as a successful lawyer which later resulted in business coming to his office, he could not be criticized. It is common knowledge that in all law offices, large or small, some of the business obtained results from favorable handling of similar matters in the locality where the attorney practices most extensively and where he has been most successful. It is also reasonable to believe that under such circumstances the railroad companies against which verdicts or settlements were obtained would not be too pleased in all cases. This would not justify, however, an open solicitation on the part of respondent or any other attorney by means of newspaper clippings, cancelled checks, photostatic copies of checks, etc., to induce claimants to seek out respondent as their attorney. Here, we have some instances where the record clearly shows that a satisfied client in a former case recommended respondent to others as an attorney. There are other instances where on direct examination certain persons claimed that they were solicited and later changed their statements. All of these matters have been somewhat reviewed herein.

We have a situation here which was recognized, particularly by the referee, and which cannot be ignored by us, and that is the type of testimony produced by petitioner to show solicitation on the part of respondent. With reference to the Burlington rail-

road particularly, it appears to have received a great deal of coöperation from the special assistant attorney general of the state of Nebraska in connection with the effort made to disbar respondent. Clearly, there are reasons why the claim departments of the railroads would be pleased to see respondent disqualified from the practice of law. The phase of this part of the proceedings that does not appeal to us particularly is that one John Samson, while acting as a special assistant attorney general for the state of Nebraska, also appears to have gone with the railroad claim agent in several instances and obtained statements from claimants on the same day that the claim settlement was made. A review of these statements would clearly indicate in most instances that they are not necessarily in the language of the claimant, but were perhaps dictated and written in the language of the party taking the statement. For example, if it is true, as claimed in the testimony of Mrs. Rose C. Kline, that Samson took her in the sheriff's car from a funeral and had her sign a statement against her wishes, little credence could be given to such a statement. We also have the case of Harry Benon, an admitted solicitor in his own right, a man not admitted to the practice of law, and a man who apparently was acceptable to the railroad companies in connection with the settlement of claims he solicited. His testimony involving respondent related to a time back in 1943, when he claims he worked for him for a few months. If the testimony of Don Chapman is to be considered, that after giving an affidavit to the railroad claim agent charging respondent with solicitation endeavors he (Benon) later came back and repudiated this statement on the claim that he had to give it "or else," his testimony could receive little recognition. So far as the deposition and the later repudiation affidavit of L. L. Cofield is concerned, we agree with the referee that no consideration can be given to them. Here is a man who claimed to have worked for respondent in 1942 and so testified in his deposition taken December 2, 1947. He then almost completely re-

pudiated his deposition in the affidavit previously referred to. His affiliation with Brennan, Superintendent of Special Service for the Santa Fe, and the methods used by the railroad company in paying him are not too convincing—a situation where apparently large sums were paid to Cofield with no special accounting record of these payments being kept by the railroad company. No credence can be given to Cofield's testimony based on his own record, and we would not consider it sufficient in itself to justify disbarment of respondent.

■ It is our conclusion that under the record here, with its many conflicts in testimony, the conflicting stories by witnesses, and the circumstances in general, that the referee's findings that respondent was not guilty of organized solicitation should be sustained.

Affirmed.

KNUTSON, JUSTICE (concurring specially).

After thoroughly reading this voluminous record, I have come to the conclusion that the testimony of many of the witnesses relied upon by the committee is of such doubtful value that the findings of the referee should be affirmed. I therefore concur in the result. In so doing, I wish to voice my disapproval of the tactics of respondent in attempting to transform this investigation of his activities into an attack upon the committee charged with the responsibility of conducting the investigation and its attorneys. I do not believe that anyone can fairly read this record without coming to the conclusion that the committee was in possession of such information at the outset as to justify, if not require, the commencement of these proceedings, if it was to perform the duties entrusted to it. No one could foresee that nearly all the witnesses whose testimony had been taken by depositions, participated in by respondent, would have so little regard for the sanctity of an oath that they would later repudiate their sworn testimony in affidavits given to respondent. Had the investigation rested upon the original depositions of the witnesses,

the outcome might well have been the opposite of what it is. In conducting an investigation of this kind, the committee acts as an arm of this court in presenting to our referee, and finally to us if there is a review, such evidence as it has. In so doing, the committee is entitled to fair treatment and a decent respect. While it may be respondent's good fortune that the witnesses relied upon by the committee had so little respect for an oath as to render their testimony unworthy of belief, I cannot read this record without coming to the conclusion that had there been more devotion to the duty resting upon respondent of fairly assisting the committee in clearing himself of the charges brought against him and less effort spent in seeking to impute to the committee an improper motive in commencing and conducting the investigation, the outcome would be more satisfactory to all concerned. If the standards of the legal profession are to be preserved, it is essential that charges of this kind be investigated, no matter from what source the information comes. The investigation should be fair to the attorney involved, to the end that those unjustly accused may be vindicated, but in like measure those charged with the unpleasant duty of conducting the investigation are entitled to fair treatment. Only by the reciprocal discharge of their respective responsibilities with fair treatment to each other may attorneys who have been improperly accused receive the vindication to which they are entitled without leaving a suspicion that all is not as it should have been and the committee be enabled to discharge its duties without having the referee lose sight of the fact that after all it is the activities of the attorney and not the committee that are under investigation.

MATSON, JUSTICE (concurring specially).

I join in the concurring opinion of Mr. Justice Knutson.

MR. JUSTICE THEODORE CHRISTIANSON, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.